**CALIFORNIA TROUT,
INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION; Southern California
Edison Company, Respondents.**

No. 01–70787.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 2002.

Filed Dec. 16, 2002.

John A. Slezak, Los Angeles, California, for the petitioner.

Timm Abendroth, Washington, D.C.; Nino J. Mascolo, Rosemead, California, for the respondents.

Before THOMPSON and RAWLINSON, Circuit Judges, and SCHWARZER,* Senior District Judge.

## OPINION

SCHWARZER, Senior District Judge:

California Trout, Inc. ("Cal Trout") petitions for review of an order of the Federal Energy Regulatory Commission ("FERC" or the "Commission") denying its request for rehearing and for revocation of the annual license for Project 1933, operated by Southern California Edison ("Edison"). We must decide whether the Commission acted within its authority in issuing annual licenses for Project 1933 pursuant to Federal Power Act ("FPA" or "the Act")

§ 15(a), 16 U.S.C. § 808(a)(1), absent Edison's compliance with the State water quality certification requirement of the Clean Water Act ("CWA") § 401(a)(1). 33 U.S.C. § 1341(a)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. THE RELICENSING PROCEEDINGS

Edison operates Project 1933, the Santa Ana River Hydroelectric Project (the "Project") in San Bernardino County, California. The Project consists of two independent water conveyance and power generation systems located on the Santa Ana River and its tributaries in San Bernardino County, and partly occupies lands of the United States within the San Bernardino National Forest. The Project diverts water from the lower portion of the Santa Ana River for water supply and power generation. It has an average annual generation of nineteen gigawatt-hours, roughly enough power to serve 2000 people, and delivers water into a water distribution system in the San Bernardino Valley for municipal, domestic, and agricultural use.

The present controversy arises out of the 1996 expiration of Edison's fifty-year license for the Project, issued by the Commission's predecessor, the Federal Power Commission ("FPC"). In 1994, Edison filed an application for a new license for the project. At the same time, Edison requested water quality certification from the California State Water Resources Control Board ("California Board"). The California Board denied certification in 1995, stating that the request lacked sufficient information. Edison appealed the denial

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

and requested that the matter be held in abeyance to facilitate discussion and possible resolution of water quality issues as well as other relicensing issues. The California Board granted Edison's request; the last abeyance ended March 19, 2002. Edison has now filed a new application for water quality certification for a new license, which remains pending.

On May 7, 1996, the Commission issued its Notice of Authorization for Continued Project Operation. The Notice referred to Edison's having filed an application for a new license for the Project pursuant to the FPA and stated:

> [N]otice is hereby given that an annual license for Project No. 1933 is issued to Southern California Edison Company for a period effective May 1, 1996, through April 30, 1997, or until the issuance of a new license for the project or other disposition under the FPA, whichever comes first. If issuance of a new license ... does not take place on or before April 30, 1997, notice is hereby given that, pursuant to 18 C.F.R. 16.18(c), an annual license under Section 15(a)(1) of the FPA is renewed automatically without further order or notice by the Commission, unless the Commission orders otherwise.

## B. CALIFORNIA TROUT'S INTERVENTION

On May 31, 2000, Cal Trout filed a petition for rehearing of the Commission's issuance of an annual license for the Project for the period from May 1, 2000, to May 1, 2001.[1] In that petition it contended that the Commission should not have issued an annual license without first requiring Edison to obtain water quality certification from the California Board. It maintained that the Commission should therefore vacate the annual license for the Project and order it to cease operations pending receipt of water quality certification. On June 21, 2000, the Commission Secretary issued a notice rejecting the rehearing request. The ground for the rejection was that § 15(a)(1) of the FPA mandates issuance of an annual license on the terms and conditions of the existing license, that issuance of the annual license is a ministerial act and non-discretionary and not a licensing action under the FPA, and that it therefore entails no proceeding in which intervention and rehearing may be sought. On July 21, Cal Trout filed a request for rehearing of the June 21 Notice, arguing that the Secretary had improperly rejected its earlier rehearing request. On August 18, the Commission granted rehearing for further consideration (a tolling order). On March 19, 2001, the Commission finally issued the order presently under review in this proceeding.

## STANDARD OF REVIEW

 We review *de novo* the Commission's interpretation of its statutory mandate. The Commission's interpretation of the CWA is not entitled to deference, *American Rivers, Inc. v. FERC*, 129 F.3d 99, 107 (2d Cir.1997) ("FERC's interpretation of Section 401, or any other provision of the CWA, receives no judicial deference under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because the Commission is not Congressionally au-

---

1. California Trout is an incorporated nonprofit environmental organization created "to help protect, conserve and restore the rivers and streams in California." It has over 5000 members, most of whom reside in the State of California, and some of whom "use the Santa Ana River and its tributaries for fishing, camping, nature study, hiking, and other recreational and aesthetic pursuits." Its standing has not been challenged in this proceeding.

thorized to administer the CWA."). However, we do give *Chevron* deference to the Commission's interpretation of the FPA.

## JURISDICTION

This court's jurisdiction to review an order of the Commission is founded on § 313(b) of the FPA which provides:

> Any party to a proceeding . . . aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals . . . by filing . . . within sixty days after the order of the Commission upon the application for rehearing, a written petition. . . .

16 U.S.C. § 825*l*(b).

On May 16, 2001, Cal Trout filed a petition to review the Commission's March 19, 2001 Notice, which denied the request for rehearing of the June 21, 2000, Order. That Notice, in turn, denied a petition for rehearing of the annual license for the period May 1, 2000, to May 1, 2001. The question is whether Cal Trout has met the jurisdictional prerequisites.

■ The Commission contends that the court lacks jurisdiction to consider Cal Trout's challenge to Edison's annual license based on lack of compliance with CWA's requirement of state water quality certification because Cal Trout failed to seek rehearing of the Commission's May 7, 1996, Notice.[2] It was this Notice that established that annual licenses would be issued during the pendency of the relicensing proceeding based on Edison's existing license, which contains no CWA certification requirement. Because Cal Trout was aggrieved by the May 7, Notice, which established annual licensing without compliance with CWA certification, the Commission argues Cal Trout's failure to seek timely rehearing of this Notice now bars it from judicial review of the 2001 order.

We think the Commission takes an unduly cramped view of what constitutes an order for purposes of judicial review. Its May 7, 1996, Notice provides for the issuance of an "annual license" subject to being "renewed automatically . . . unless the Commission orders otherwise." The Notice was issued pursuant to § 15(a)(1), which states that "[T]he Commission shall issue from year to year an annual license to the then licensee under the terms and conditions of the existing license. . . ." Congress could readily have provided for the issuance of an interim license effective for the period of the relicensing proceedings, i.e., until issuance of a new license. It did not do so, and instead, provided for annual relicensing. Its choice of language must be given effect. Even though no writing manifests the annual issuance of a license and the issuance occurs automatically, it is nevertheless an exercise of the Commission's authority and, as the Notice states, is subject to its power to order otherwise. We conclude that the annual issuance of a license is the functional equivalent of an order and is subject to review from year to year.[3]

2. Section 313(a) provides: "No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon." 16 U.S.C. § 825*l*(a).

3. In its Final Order, the Commission states that under its long-standing practice, annual licenses are a *post-licensing matter* in which rehearing is not available except in circum-

stances not present here. It therefore elected to treat Cal Trout's request as a petition permitted under its rules to seek discretionary action by the Commission where no other form of pleading is available. 18 C.F.R. § 385.207(a)(5). Because such a petition gives the Commission the same opportunity as a request for rehearing to address grounds subsequently raised in a petition for review,

Our conclusion is consistent with the decision in *Lac Courte Oreilles Band v. Federal Power Commission*, 510 F.2d 198 (D.C.Cir.1975). There, the Commission had issued annual licenses in August 1971, 1972, and 1973. Petitioner filed an application for rehearing concerning the second of these licenses in 1972. Without questioning its jurisdiction, the court entertained the petition to review the issuance of this and a subsequent license.[4]

Our conclusion also makes sense as a matter of policy. The position taken by the Commission here would effectively render annual licenses immune to judicial review in perpetuity once the initial period for rehearing has passed. The Commission's argument wrongly assumes that any ground for rehearing necessarily exists only at the time of the original issuance. Yet circumstances may change or newly arise subsequent to the original issuance of the annual license that give grounds for rehearing and potentially for the imposition of conditions to the extent permitted by law. *See Platte River Whooping Crane v. FERC*, 876 F.2d 109, 114 (D.C.Cir.1989) *("Platte I")* (stating that FERC has authority to formulate conditions, or seek cooperation of other parties in adding conditions to annual licenses, where the existing license contains a reservation of authority for FERC to impose conditions).

We, therefore, conclude that we have jurisdiction to review the petition under § 825*l*(b).

## APPLICATION OF THE CWA TO ANNUAL LICENSES

■ The Commission issued annual licenses to Edison under § 15(a), which provides, in substance, that if the United States does not exercise its right to take over a project at the expiration of a license, the Commission may issue a new license to the existing or a new licensee. 16 U.S.C. § 808(a)(1).[5] Critical to this appeal is the following provision:

[I]n the event the United States does not exercise the right to take over or does not issue a license to a new licensee, or issue a new license to the existing licensee, upon reasonable terms, then the commission shall issue from year to year an annual license to the then licensee under the terms and conditions of the existing license until the property is taken over or a new license is issued as aforesaid.

Cal Trout contends that the issuance of annual licenses after the expiration of the original fifty-year license is subject to the requirement of State water quality certification under CWA § 401(a)(1). That statute provides in relevant part:

Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable wa-

---

we see no basis for making a distinction between them for purposes of Section 313.

**4.** *Sierra Association for Environment v. FERC*, 791 F.2d 1403, 1407 (9th Cir.1986) *("SAFE ")*, on which the Commission and Edison rely, is inapposite. In SAFE, petitioners attempted to seek review of an earlier order staying the effective date of a license by challenging a later order denying a request to terminate the license. The court rejected the attempt as an impermissible collateral attack. The issue in this case is whether the May

2000, annual license is an order subject to review in this court.

**5.** The Commission's regulations provide that "The Commission will issue an annual license to an existing licensee under the terms and conditions of the existing license upon expiration of its existing license to allow ... (1) The licensee to continue to operate the project while the Commission reviews any applications for a new license...." 18 C.F.R. § 16.18(b).

ters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, ... that any such discharge will comply with the applicable provisions of [this] title.... If the State ... fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived .... No license or permit shall be granted if certification has been denied by the State.

33 U.S.C. § 1341(a)(1).

While Edison applied to the California Board for a certification for the new license, it did not apply for or receive a certification for its annual license. Cal Trout argues that the issuance of the annual licenses under the Notice of May 7, 1996, is an issuance of a federal license, which may result in discharge into the navigable waters of the United States. Those licenses are therefore subject to § 401(a)(1). Because no water quality certification has issued, the Commission is precluded from issuing annual licenses for the project.

Rejecting Cal Trout's argument, the Commission held that the issuance of an annual license under § 15(a)(1) is a minis-terial and nondiscretionary act, a statutory mechanism that requires the Commission to authorize continued project operation under the terms and conditions of the original license. It is therefore not a licensing action that triggers the requirements of CWA.

■ FERC's interpretation of § 15(a)(1), which is entitled to *Chevron* deference, also conforms to settled law. While the Commission's issuance of project licenses under § 4(e) of the Act is subject to the State certification requirement of § 401, *see Keating v. FERC*, 927 F.2d 616, 619 (D.C.Cir.1991), the issuance of annual licenses is a "non-discretionary act, in that the Commission has no choice but to issue the licenses to the existing licensees." *Platte I*, 876 F.2d at 114 (citations omitted). That is true even where it may lack legal authority to issue a new project license. In *Lac Courte*, the court upheld the issuance of an annual license in the face of the contention that the Indian Reorganization Act and an 1854 Treaty gave petitioner a veto power over the licensing of the project. 510 F.2d at 205.[6] Only where the original licenses contain provisions allowing introduction of new conditions does the Commission have authority to add conditions, such as compliance with Section 401, without the licensee's consent. *See* 16 U.S.C. § 799 ("Licenses ... may be altered ... only upon mutual agreement between the licensee and the Commission. ...");[7] *Platte I*, 876 F.2d at 118; *Platte River Whooping Crane v. FERC*, 962 F.2d

---

6. The court held that "even if the Commission could not issue a new license over the objections of the Band, § 15(a) ... mandates that annual licenses issue until Congress has had an opportunity to evaluate whether it desires to exercise its option of recapturing the project." 510 F.2d at 204 n. 21. Thus, the State's veto power under § 401 remains subject to being preempted by Congress' ability to recapture the project.

7. In view of the prohibition against nonconsensual alteration of a license of § 799, Cal Trout's reliance on § 16.18(d) of the Commission's regulations, authorizing the Commission to incorporate additional interim conditions in issuing an annual license, is misplaced. *See* 18 C.F.R. § 16.18(d).

27, 32–3 (D.C.Cir.1992) ("*Platte I*"). Edison's license contained no such a reservation.

Moreover, Cal Trout's request that Edison's annual license be revoked for lack of certification flies in the face not only of the statutory language but also of the legislative purpose undergirding § 15(a)(1). As the court in *Lac Courte* explained:

> Congress fashioned Section 15 to prevent abrupt termination of a power project which should, in the public interest, be continued.... Section 15(a) annual licenses are designed to prevent a possible hiatus in the operation of a project while either of these decisions [issuance of a new license or recapture of the Project by the government] is being made, preserving the status quo at the expiration of a long-term license and thereby guaranteeing that "industries created by (Commission projects) and dependent upon them may not suffer."

510 F.2d 198, 205–06.[8]

 Cal Trout contends that § 15(a)(1) can be "harmonized" by permitting the issuance of annual licenses so long as the State has granted or waived water quality certification for the licensed activity. Because § 401(a)(1) gives the State up to one year within which to act on a request for certification, such an approach would, as a practical matter, amount to a partial repeal by implication of the annual license provision of § 15. Repeals by implication are not favored. *See Ruckel-*

*shaus v. Monsanto Co.,* 467 U.S. 986, 1017, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *Monongahela Power Co. v. Marsh,* 809 F.2d 41, 53 n. 116 (D.C.Cir.1987). The authority to issue annual licenses is a specific provision applying to a specific situation, i.e., the continued operation of a project pending relicensing. The CWA, on the other hand, is a general statute having broad application. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (holding that an employment preference within the Bureau of Indian Affairs for qualified Indians could readily coexist with a general rule prohibiting employment discrimination on the basis of race). Nothing before us indicates that in enacting CWA, Congress intended to restrict the authority of the Commission to prevent a shut down of a licensed project pending relicensing. We think that when Congress required applicants for a license to provide a State certification, it intended to give States control over new or altered projects, not over the continued operation of a lawfully licensed project pending its relicensing. Reading § 15(a)(1) and § 401(a)(1) in context, we conclude that Congress did not intend "applicant" to have its literal effect so as to include a recipient of an annual license. *See Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673,

---

8. *Lac Courte* further notes:

 The legislative history of the original § 15, which first appeared in the conference report to the Federal Power Act of 1920, see H.R.Rep. No. 1147, 65th Cong., 3d Sess., 9 (1919), is rather scant. However, in explaining the conference report, the Chairman of the Special Water Committee of the House stated that the annual license provisions were requested by the Senate confer-

 ees, who "were very insistent upon not having a possible hiatus" in the operation of a project until Congress had acted or a new license had been granted. 57 CONG. REC. 4637 (1919) (remarks of Rep. Sims). *See also* S.REP. NO. 180 ("The works must be continued in operation at the end of 50 years in order that the industries created by them may not suffer.").
 510 F.2d at 206 n. 33.

**1138**

68 L.Ed.2d 80 (1981).[9]

Our conclusion does not undermine the effectiveness of the CWA. Both the CWA and FPA can function comfortably side by side because no new project license or license amendment can issue without compliance with the State certification requirement. *See Keating v. FERC, supra.* Nor does it open the way to perpetual operation under annual licenses. The Commission has acknowledged that "annual licenses for [a project] will cease when the [relicensing/recapture] proceeding is completed." *Lac Courte,* 510 F.2d at 209 (quoting *Concerning Commission Authority to Issue New License, etc.,* 50 FPC 753, 773 (1973)); see also, 18 C.F.R. § 16.18(b). The *Lac Courte* court itself observed that "Commission and congressional action is proper even significantly after the license expiration date, and interim licenses should issue so long as the Commission is proceeding in good faith with the hearings necessary to make a proper disposition of the project." 510 F.2d at 207 (citation omitted).[10] Adopting that view, and with that caution to the Commission, we deny the petition.[11]

DENIED.

---

9. That conclusion is reinforced by the fact that the licensee who receives an annual license "not only ha[s] the right, but also the obligation to operate [the project] under interim annual licenses." *Lac Courte,* 510 F.2d at 208.

10. We express no view of the outcome of a case where an annual license has become a *de facto* renewal.

11. Our disposition of the petition makes it unnecessary to address FERC's alternate ground under § 9(b) of the Administrative Procedure Act. 5 U.S.C. § 558(c).