Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 21, 2002                Decided April 11, 2003

No. 01-1408

ALABAMA RIVERS ALLIANCE,
AMERICAN RIVERS, INC. AND LAKE WATCH OF LAKE MARTIN,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ALABAMA POWER COMPANY,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Ronald A. Shems* argued the cause for the petitioners.

*David K. Mears*, Senior Counsel, Office of the Attorney General, State of Washington, argued the cause for *amici*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*curiae* States of Washington *et al*. *Christine O. Gregoire*, Attorney General, State of Washington, Frankie Sue Del Papa, Attorney General, State of Nevada, and William H. Sorrell, Attorney General, State of Vermont, were on brief.

*David H. Coffman*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, were on brief. *Timm L. Abendroth* entered an appearance.

*James H. Hancock Jr.* and *P. Stephen Gidiere III* were on brief for intervenor Alabama Power Company. *Jennifer M. Buettner* entered an appearance.

*Donald H. Clarke* and *Henri D. Bartholomot* were on brief for *amici curiae* National Hydropower Association and Edison Electric Institute.

Before: HENDERSON, TATEL and GARLAND, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioners Alabama Rivers Alliance, American Rivers, Inc. and Lake Watch of Lake Martin seek review of the decision of the Federal Energy Regulatory Commission (FERC or Commission) to amend an existing hydroelectric license issued to Alabama Power Company (Alabama Power). The amended license authorizes Alabama Power to replace three existing turbine generators at its Martin Dam Project on the Tallapoosa River with new, more efficient units. The petitioners contend that the Commission erred in issuing the license amendment without first requiring Alabama Power to obtain water quality certification from the state of Alabama. Because we conclude that an increase in the volume of water passing through the dam's replacement turbines "may result in any discharge into the navigable waters" within the meaning of section 401(a)(1) of the Clean Water Act (CWA), 33 U.S.C. § 1341(a)(1), we grant the petition for review and vacate the Commission's orders.

## I. Background

### A. The Regulatory Framework

The Federal Power Act (FPA) authorizes FERC to issue licenses "for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient . . . for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction" under the Commerce Clause. 16 U.S.C. § 797(e). These hydroelectric licenses contain certain conditions that FERC deems necessary to improve and utilize the nation's waterways in general and water-power development in particular. *Id.* § 803(a). Upon "mutual agreement" between the Commission and a licensee, FERC may amend such licenses, which are issued "for a period not exceeding fifty years." *Id.* § 799.

Although "the FPA represents a congressional intention to establish 'a broad federal role in the development and licensing of hydroelectric power,'" the CWA "has diminished [the FPA's] preemptive reach by expressly requiring the Commission to incorporate into its licenses state-imposed water-quality conditions." *Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 111 (2d Cir. 1997) (quoting *California v. FERC*, 495 U.S. 490, 496 (1990)). FERC's hydroelectric licenses are thus subject to, among other conditions, the requirements of section 401 of the CWA. *See Escondido Mut. Water Co. v. La Jolla Indians*, 466 U.S. 765, 775 (1984) ("[W]hile Congress intended that the Commission would have exclusive authority to issue all licenses, it wanted the individual Secretaries [*i.e.*, the Secretaries of the Interior, War and Agriculture] to continue to play the major role in determining what conditions would be included in the license in order to protect the resources under their respective jurisdictions.").

Section 401(a)(1) of the CWA provides that "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification

from the State in which the discharge originates or will originate." 33 U.S.C. § 1341(a)(1). The required certification must provide that such discharge will comply with the applicable water quality standards of the CWA, as well as with "any other appropriate requirement of state law." *Id.* § 1341(d).[1] Any limitations included in the state certification become a condition on the federal license. *Id.* If the "originating" state denies an applicant section 401(a)(1) certification, FERC may not issue that applicant a hydroelectric license. *Id.* § 1341(a)(1).[2]

## B. *The License Amendment Proceedings*

Located on the Tallapoosa River in central Alabama, Alabama Power's Martin Dam Project has the capacity to generate 154.2 megawatts (MW) of electric power. The dam project generates electricity by taking in water from the reservoir above the dam, funneling the water through four turbine generators and then releasing the water through four penstocks into the river below the dam. The first three 33–MW turbine generators began commercial operation in 1927.

---

[1] More specifically, the state certification must "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification." 33 U.S.C. § 1341(d).

[2] If a state lacks the authority to grant such a certification, the Administrator of the Environmental Protection Agency determines whether an activity or project may be certified. *Id.* § 1341(a)(1). In Alabama, an application for water quality certification is made to the Alabama Department of Environmental Management (ADEM). ALA. CODE § 22–22A–5. After a prescribed notice and comment period, ADEM issues a final decision on the license application. *Id.* An applicant denied certification may appeal the decision to the Alabama Environmental Management Commission and, thereafter, to the state circuit court. *Id.* § 22–22A–7.

Alabama Power added a fourth, 55.2 MW generator in 1952. Although FERC originally licensed the Martin Dam Project in 1923, it issued a new 40–year license to Alabama Power in 1978.

On December 22, 2000, Alabama Power filed an application with the Commission to amend its license to authorize the replacement of the three 33–MW turbine generators. These units had exhibited serious leakage problems and efforts to repair them had been largely unsuccessful. According to Alabama Power's estimates, the replacement turbines would increase the flow of water into the river below the dam project by approximately 900 cubic feet per second (cfs), an increase of 8.6%, and would increase each generator's capacity by 7 to 10 MW, an increase of roughly 20–30%.

Shortly after the Commission provided public notice of Alabama Power's license amendment application, the petitioners moved to intervene, arguing that section 401(a)(1) of the CWA required Alabama Power to obtain state water quality certification before the Commission could amend its existing license. On May 23, 2001, the Commission issued an order approving Alabama Power's proposed license amendment. *Ala. Power Co., Project No. 349–070, Order Amending License*, 95 F.E.R.C. ¶ 62,156 (May 23, 2001) (*Order Amending License*). In doing so, the Commission rejected the petitioners' argument that the license amendment required state water quality certification under section 401(a)(1), concluding that "[r]eplacing and upgrading the existing turbine-generator units is not an 'activity which may result in a discharge' within the meaning of [s]ection 401(a)(1)." *Id.* at 64,220.

While the Commission recognized that "replacement of the turbine generators would increase the [dam] project's hydraulic capacity, with the result that water would be discharged more quickly [into the river]," it found that "the nature of the discharge would not change," *i.e.*, that "water from the reservoir would continue to be released through the new turbine generators in essentially the same manner as it is now released through the existing turbine generators." *Id.* Rea-

soning that section 401(a)(1) requires certification only for "'activities which may *result* in a discharge,' not activities which may *alter* an already existing discharge," the Commission held that section 401(a)(1) did not apply to Alabama Power's amended license. *Id.* (citing *North Carolina v. FERC*, 112 F.3d 1175, 1188 (D.C. Cir. 1997), *cert. denied*, 522 U.S. 1108 (1998)) (emphasis in original).[3]

The Commission's *Order Amending License* likewise rejected the petitioners' argument that 18 C.F.R. § 4.38(f)(7)(iii) required Alabama Power to obtain state water quality certification for its proposed license amendment. *Id.* Section 4.38(f)(7)(iii) provides that "any application to amend an existing license . . . requires a new request for water quality certification . . . if the amendment would have a material adverse impact on the water quality in the discharge from the project." 18 C.F.R. § 4.38(f)(7)(iii). Citing its environmental assessment of the proposed license amendment, the Commission concluded that the proposed modifications to the three 33–MW turbine generators would not have a "material adverse effect" on the water quality of the dam project's discharge. *Order Amending License*, 95 F.E.R.C. at 64,220. Accordingly, the Commission held that section 4.38(f)(7)(iii) did not require Alabama Power to obtain state water quality

---

[3] The Martin Dam Project's turbine generators draw water from the hypoxic—*i.e.*, oxygen poor—layer of the reservoir. Although the replacement turbines will release low dissolved oxygen (DO) water into the river at an increased rate of 900 cfs, the Commission did not consider this increase to be a "discharge" under section 401(a)(1). *See Order Amending License*, 95 F.E.R.C. at 64,220. Relying on its environmental assessment of the proposed license amendment, the Commission concluded that the Martin Dam Project's existing draft tube aeration system—a system which typically raises DO levels in the project's discharges by about 2 milligrams per liter (mg/l)—would ensure that the project continued to provide DO levels of 4 mg/l or greater, *i.e.*, the DO level required by Alabama's water quality standards. *Id.* Nevertheless, "to ensure that the aeration system operates correctly," the Commission ordered Alabama Power to "develop and file, for Commission approval, a plan to monitor the DO content of project releases." *Id.*

certification in applying to amend its existing hydroelectric license. *Id.*

The petitioners moved for rehearing. On July 23, 2001, the Commission denied the motion, again rejecting the argument that section 401(a)(1) required Alabama Power to obtain state water quality certification for its proposed license amendment. *Ala. Power Co., Project No. 349–078, Order Denying Rehearing*, 96 F.E.R.C. ¶ 61,096 (July 23, 2001) (*Order Denying Rehearing*). Relying on *North Carolina v. FERC*, 112 F.3d 1175 (D.C. Cir. 1997), the Commission explained that section 401(a)(1) applies only to activities that may " 'result in a discharge,' " not to those activities that simply alter an existing discharge, *Order Denying Rehearing*, 96 F.E.R.C. at 61,386. Alabama Power's license amendment did not trigger the certification requirements of section 401(a)(1), the Commission reasoned, because replacement of the existing turbine generators "will at most alter an existing discharge by increasing the amount of water flowing through the units at any given time and, concurrently, reducing the amount of time that the units will operate each day."[4] *Id.*

Noting that all construction would be completed within the existing structures of the dam project as well as "in the dry," the Commission dismissed the petitioners' argument that replacement of the turbine generators would result in a

---

[4] The Commission found that the total volume of water released from the dam project would not change as a result of the installation of the new turbine generators. *Order Denying Rehearing*, 96 F.E.R.C. at 61,387 n.10. Specifically, the Commission found that although the new turbine generators would increase the rate of discharge by 8.6%, the generators would release water "over a 7.5–hour period instead of an 8–hour period during weekday times of peak generation." *Id.* at 61,387 & n.10.

With respect to the increase in low DO water associated with the increased flow volume, the Commission iterated its conclusion that Alabama Power's draft tube aeration system would continue to operate as it had in the past, thereby ensuring that DO concentrations in the Tallapoosa River would remain above 4 mg/l. *Id.* at 61,387.

discharge of dust, grease and oil.[5] *Id.* at 61,386–87. The Commission rejected the notion that removal of the old turbine generators could result in any such discharge and, in addition, concluded that the possible release of "trace amounts of dust or grease" during the initial installation of the new turbine generators was an insufficient basis to conclude that the replacement would result in a discharge requiring certification under section 401(a)(1).[6] *Id.* at 61,387. We now review the Commission's orders.

## II. Analysis

On review, the petitioners maintain that the Commission erred in issuing Alabama Power's proposed license amendment without first requiring Alabama Power to obtain a water quality certification from the state of Alabama.[7] Specifically,

---

[5] Because operation of the turbine generators would cease during construction, "[w]ater would not come in contact with the construction area nor the replacement turbines until the construction is completed." *Order Amending License*, 95 F.E.R.C. at 64,225. Thus, the term "in the dry."

[6] Citing Alabama Power's failure to raise the issue in its request for rehearing, the Commission declined to address the applicability of 18 C.F.R. § 4.38(f)(7)(iii)—its material adverse impact regulation—to Alabama Power's license amendment application. *See Order Denying Rehearing*, 96 F.E.R.C. at 61,386 n.3.

[7] Alabama Power argues that the petitioners are collaterally estopped from asserting that section 401(a)(1) certification is required before the Commission can amend a license authorizing a licensee to replace existing turbine generators at a licensed hydroelectric project. Collateral estoppel applies, Alabama Power maintains, because the petitioners failed to seek judicial review of a previous FERC order authorizing Alabama Power to replace a single turbine generator at its Holt Dam Project. *See Ala. Power Co., Project No. 2203–008, Order Denying Rehearing*, 94 F.E.R.C. ¶ 61,150 (February 21, 2001) (*Holt*). This argument is without merit.

While courts have not hesitated to apply collateral estoppel " 'to those determinations of administrative bodies that have attained finality,' " *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5,

the petitioners challenge the Commission's conclusion that the installation and operation of the three new turbine generators at the Martin Dam Project is not an "activity . . . which may result in any discharge" for purposes of section 401(a)(1). 33 U.S.C. § 1341(a)(1). They insist that the installation and operation of the new turbine generators "may result" in at least two discharges into the Tallapoosa River: (1) an increased flow of water, and particularly of low dissolved oxygen (DO) water, *see supra* note 3, passing through the dam's replacement turbines and (2) the release of dust, grease and oil during the installation of the replacement turbines. We agree with the petitioners as to the first of the claimed discharges and, on that basis, grant the petition and vacate the Commission's orders.[8]

_____

9 (D.C. Cir. 2001) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991)), the doctrine "only applies to issues 'in substance the same as those resolved' in an earlier proceeding," *Kidwell v. Dep't of Army*, 56 F.3d 279, 287 (D.C. Cir. 1995) (quoting *Montana v. United States*, 440 U.S. 147, 155 (1979)), and bars relitigation only by those parties who actually litigated the issue in the prior proceeding, *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 237 n.11 (1998) ("In no event . . . can issue preclusion be invoked against one who did not participate in the prior adjudication."). As the petitioners correctly observe, Alabama Power's collateral estoppel argument fails on both counts. First, the Commission's previous order did not consider whether an increased water flow "may result in any discharge" under the plain language of section 401(a)(1), but rather whether 18 C.F.R. § 4.38(f)(7)(iii) applied to the particular facts of that case. *See Holt*, 94 F.E.R.C. at 61,569–70. Second, one of the three petitioners here—Lake Watch of Lake Martin—did not participate in the *Holt* litigation. *Id.* at 61,567.

[8] Because we conclude that the first of the described discharges triggers the certification requirements of section 401(a)(1), there is no cause for us to decide whether the second does so as well. *See Pub. Util. Dist. No. 1 v. Wash. Dep't of Ecology*, 511 U.S. 700, 711 (1994) (*PUD No. 1*) (quoting 33 U.S.C. § 1341(d)) (holding CWA's certification provision "refers to the compliance of the applicant, not the discharge," and "thus allows the State to impose 'other limitations' on the project in general to assure compliance with various

## *A. Standard of Review*

We review a Commission licensing decision under the FPA to determine whether it was "arbitrary and capricious." *North Carolina*, 112 F.3d at 1189; *Bangor Hydro–Elec. Co. v. FERC*, 78 F.3d 659, 663 & n.3 (D.C. Cir. 1996). In reviewing such a decision, we must treat the Commission's findings of fact as "conclusive" if they are "supported by substantial evidence." 16 U.S.C. § 825*l*(b). Because the petitioners did not challenge the Commission's factual findings in their request for rehearing, however, they are precluded from doing so now. *See id.* We therefore consider the Commission's findings of fact to be conclusive.

As a result, we must simply resolve a question of statutory interpretation—whether the installation and operation of the replacement turbines is an activity that "may result in any discharge" within the meaning of section 401(a)(1) of the CWA. 33 U.S.C. § 1341(a)(1). The Commission's interpretation of the CWA is not entitled to the usual judicial deference, however, because the Environmental Protection Agency (EPA)—and not FERC—is charged with administering the statute.[9] *See* 33 U.S.C. § 1251(d) ("Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency . . . shall administer this chapter."); *Cal. Trout, Inc. v. FERC*, 313 F.3d 1131, 1133–34

---

provisions of the [CWA] and with 'any other appropriate requirements of State law' ").

[9] Although our opinion in *North Carolina* suggests that *Chevron* deference applies to FERC's construction of the CWA, our statement to that effect was dicta. *North Carolina*, 112 F.3d at 1183. Setting out the standard of review, we stated that "[w]hen reviewing 'an agency's construction of the statute which it administers,' we apply the two-part test developed by the Supreme Court in [*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984)]." *Id.* Yet, as discussed above, it is EPA—and not FERC—that administers the CWA. *See* 33 U.S.C. § 1251(d). Furthermore, we did not defer to the Commission's interpretation of the CWA in *North Carolina*, having found the meaning of section 401(a)(1) unambiguous. *North Carolina*, 112 F.3d at 1183.

(9th Cir. 2002) (Commission's interpretation of CWA not entitled to deference); *Am. Rivers*, 129 F.3d at 107 (same); *see also City of Olmsted Falls v. FAA*, 292 F.3d 261, 270 (D.C. Cir. 2002) ("[W]hen we are faced with an agency's interpretation of a statute *not* committed to its administration, we give no deference.") (emphasis in original). We therefore review the Commission's interpretation of section 401(a)(1)—a purely legal question—*de novo*. *See Cal. Trout*, 313 F.3d at 1133–34 (Commission's interpretation of section 401(a)(1) reviewed *de novo*); *Am. Rivers*, 129 F.3d at 107 (same); *see also Chevron*, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); *Ass'n of Civilian Technicians v. FLRA*, 269 F.3d 1112, 1115–16 (D.C. Cir. 2001) (FLRA's interpretation of Travel Expenses Act—statute it does not administer—reviewed *de novo*).[10]

## B. *The Increased Water Flow*

The petitioners' argument is a straightforward one. As previously discussed, section 401(a)(1) requires state water quality certification for "any activity . . . which may result in any discharge into the navigable waters." 33 U.S.C. § 1341(a)(1). Emphasizing that water must flow through the turbine generators and be discharged in order for the dam project to produce electricity, the petitioners argue that the licensed activity—*i.e.*, the installation and operation of the

---

[10] While the petitioners rely primarily on the plain language of section 401(a)(1) in arguing that Alabama Power's license amendment requires state water quality certification under the CWA, they also contend that, if we look beyond the text of the CWA, we should defer to EPA's interpretation of section 401(a)(1). EPA's interpretation of section 401(a)(1) is embodied, the petitioners maintain, in 40 C.F.R. §§ 122.63 and 124.53, and in a March 5, 2001 letter sent to the Commission. Because we agree with the petitioners' plain language argument, however, we need not consider the degree of deference owed—if any—to the regulations and letter the petitioners note. *See United States v. Mead Corp.*, 533 U.S. 218, 227–31 (2001).

replacement turbines—will necessarily result in "any discharge" into the Tallapoosa River. Specifically, the petitioners maintain that the operation of the new turbine generators will result in an increased flow of water "significantly different in volume, timing, and intensity," as well as in the amount of DO, from the flow of water passing through the old turbines. Br. for Pet'r at 16. The petitioners thus reason that, under the plain language of section 401(a)(1), Alabama Power's license amendment required state water quality certification.

The Commission contends, however, that the petitioners misinterpret the plain language of section 401(a)(1) and thereby misunderstand what must be shown in order to establish that an activity "may result in any discharge."[11] 33 U.S.C. § 1341(a)(1). More specifically, the Commission asserts that the petitioners' argument runs afoul of our reasoning in *North Carolina*, a case in which we considered whether FERC violated section 401(a)(1) by issuing an amended hy-

---

[11] Arguing for the first time on review that the terms "discharge" and "discharge of a pollutant" are one and the same under section 401(a)(1)'s certification requirements, the Commission also defends its licensing decision on the alternative ground that an increased flow of water through a hydroelectric project is not a "discharge of a pollutant." While we have already expressed "serious reservations" about the Commission's attempt to redefine the statutory term "any discharge," *North Carolina*, 112 F.3d at 1186, well-established principles of administrative law preclude us from considering on review a theory not relied upon by the agency below, *see, e.g., Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000) (quoting *W. Res., Inc. v. FERC*, 9 F.3d 1568, 1576 (D.C. Cir. 1993) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))) (noting "the 'time-honored rule that a reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency." ' "). *See also PUD No. 1*, 511 U.S. at 711 (noting "[t]here is no dispute that petitioners were required to obtain a certification from the State pursuant to [section] 401" because petitioners "concede that, at a minimum, the project will result in two possible discharges," including "the discharge of water at the end of the tailrace after the water has been used to generate electricity").

droelectric license authorizing a licensee to *decrease* the flow of water passing through a dam's turbine generators without first receiving state water quality certification. *North Carolina*, 112 F.3d at 1180–83. Rejecting the argument that section 401(a)(1) requires state water quality certification simply because an activity will "result in an altered discharge," we reasoned as follows:

> [T]he existence of certification rights under [s]ection 401(a)(1) does not depend on whether a discharge is "altered." Section 401(a)(1) certification rights vests only if an activity "may result in" a discharge. This distinction is of no small moment. The word "alter" means to change something from its previous state, WEBSTER'S NEW INT'L DICTIONARY 63 (3rd ed. 1961) ("to cause to become different"), implying that the thing changed was already in existence. By contrast, the word "result" implies causation. *See id.* at 1937 ("arise as a consequence"). Obviously, a subsequent event cannot be the cause of something that is already in existence. Given the disparity between petitioners' proposed test and the words of the [CWA], we elect to remain faithful to the language chosen by Congress and require that an activity "result in" a discharge in order to trigger the certification requirements of [s]ection 401(a)(1).

*Id*. at 1188.

Citing "the lack of equivalence between [an] activity that may *increase* [per-second water flows] and [an] activity that '*may result in*' such flows," Br. for Resp't at 12 (emphasis in original), the Commission contends that our reasoning in *North Carolina* applies with equal force here. Replacement of the turbine generators cannot, in the Commission's view, possibly "result in" water flows that "pre-existed and will continue, in some form, regardless of whether that replacement is approved." *Id*. at 14–15. At most, the Commission argues, replacement of the turbine generators will " 'alter an existing discharge by increasing the amount of water flowing through the units at any given time and, concurrently, reduc-

ing the amount of time that the units will operate each day.'" *Id*. at 14 (quoting *Order Denying Rehearing*, 96 F.E.R.C. at 61,386).

Yet the Commission's argument ignores the critical feature of the licensing activity at issue in *North Carolina*: operation of the pipeline project—*i.e.*, the "activity" authorized by the license amendment—resulted in the *withdrawal* of water from the Lake Gaston reservoir. *North Carolina*, 112 F.3d at 1187. In our view, the distinction between an increased discharge and a decreased discharge is "of no small moment." *Id*. at 1188. But this should hardly come as a surprise, for we recognized as much in *North Carolina* itself. Relying on the definition of "discharge of a pollutant" and "discharge of pollutants,"[12] we observed that "the word 'discharge' contemplates the *addition*, not the withdrawal, of a substance or substances." *Id*. at 1187 (emphasis added). Because the operation of the pipeline project would not result in the "addition" of anything to Lake Gaston, we held that "[a] decrease in the volume of water passing through the dam turbines cannot be considered a 'discharge' as the term is defined in the CWA." *Id*. at 1188 ("Obviously, the withdrawal of water from Lake Gaston will add nothing; nor will the withdrawal of water from Lake Gaston increase the volume of water flowing through the turbines of the Project dams.").

---

[12] As we explained in *North Carolina*, the CWA does not provide an express definition of "discharge" but rather a statement of inclusion: "The term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants." 33 U.S.C. § 1362(16). We therefore found the definition of "discharge of a pollutant" and "discharge of pollutants" instructive as "the nearest evidence we have of definitional intent by Congress." *North Carolina*, 112 F.3d at 1187. The CWA defines the terms "discharge of a pollutant" and "discharge of pollutants" as "(A) any *addition* of any pollutant to navigable waters from any point source [and] (B) any *addition* of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12) (emphasis added).

The plain language of section 401(a)(1) and our construction of that language in *North Carolina* thus compel us to conclude that Alabama Power's installation and operation of the new turbine generators at its Martin Dam Project is an "activity . . . which may result in any discharge" within the meaning of section 401(a)(1). 33 U.S.C. § 1341(a)(1). As discussed above, "the word 'discharge' contemplates the addition . . . of a substance or substances" into the navigable waters. *North Carolina*, 112 F.3d at 1187. Here, the Commission concluded that the replacement turbines would increase the flow of water into the river by approximately 900 cfs. Thus, at the very least, the replacement turbines will release low DO water into the river at an increased rate of 900 cfs. The installation and operation of the replacement turbines is therefore an activity that "may result in any discharge." 33 U.S.C. § 1341(a)(1).

Our rejection in *North Carolina* of the "altered discharge" argument does not preclude this conclusion. *North Carolina*, 112 F.3d at 1188 (distinguishing activities that "alter" discharge from those that "may result in" discharge). While a decreased discharge does not "cause" a discharge under section 401(a)(1), *see id.*, an increased discharge does in fact cause or, in the words of the statute, "result in" a discharge requiring state water quality certification, 33 U.S.C. § 1341(a)(1). Unlike an activity that reduces—and thus simply alters—a discharge with state water quality certification, an activity that increases a discharge poses a distinct risk— *i.e.*, that the increased discharge may have negative water quality effects (such as low DO) that were either minimal or non-existent at the previous discharge level. Because it is the *increase* in the discharge that creates or "causes" this risk to water quality, *cf. North Carolina*, 112 F.3d at 1188, an increased discharge—unlike a decreased discharge—may "result in" a discharge under section 401(a)(1).[13]

[13] Notwithstanding the resulting increase in low DO water indicates a potentially deleterious effect of the increased water flow, the CWA assigns to the states the responsibility of assessing the water quality effects of a discharge. *See* 33 U.S.C. § 1341(a)(1), (d).

The Commission's reliance on the unchanged daily volume of the discharge is similarly misplaced. *See supra* note 4. While perhaps persuasive at first glance, the Commission's "total daily volume" argument suffers from a fatal flaw: it lacks any basis in the statutory language of section 401(a)(1). To wit, the Commission has offered no argument—persuasive or otherwise—as to why "*any* discharge" should be measured on a daily, as opposed to on a weekly or even yearly, basis. 33 U.S.C. § 1341(a)(1) (emphasis added). Given the possibility that even a temporary increase in a discharge could have a negative water quality impact, "we elect to remain faithful to the language chosen by Congress," *North Carolina*, 112 F.3d at 1188, and hold that an activity that "may result in *any* discharge" triggers the certification requirements of section 401(a)(1), 33 U.S.C. § 1341(a)(1) (emphasis added).[14]

### III. Conclusion

For the foregoing reasons, we conclude that section 401(a)(1) of the CWA requires Alabama Power to obtain

Accordingly, we decline to consider whether the Martin Dam Project's draft tube aeration system would prevent DO levels from dropping below Alabama's water quality standards. *See supra* notes 3–4.

[14] Intervenor Alabama Power suggests that 18 C.F.R. § 4.38(f)(7)(iii) provides an independent ground in support of the Commission's decision. That regulation states that "any application to amend an existing license . . . requires a new request for water quality certification . . . if the amendment would have a material adverse impact on the water quality in the discharge from the project." 18 C.F.R. § 4.38(f)(7)(iii). The Commission's brief, however, does not mention this regulation at all. And while the Commission's orders do cite the regulation, *see Order Denying Rehearing*, 96 F.E.R.C. at 61,386 n.3; *Order Amending License*, 95 F.E.R.C. at 64,220, they do not cite it as an independent ground in support of the decision. Rather, they discuss the regulation in the course of rejecting the petitioners' argument that the regulation provides an independent ground for reversing the decision and requiring certification. *See Order Denying Rehearing*, 96 F.E.R.C. at 61,386 n.3; *Order Amending License*, 95 F.E.R.C. at 64,220.

water quality certification from the state of Alabama before the Commission can issue a license amendment authorizing Alabama Power to replace the three 33–MW turbine generators at its Martin Dam Project. Because the Commission issued the license amendment to Alabama Power without having such certification, we grant the petition for review and vacate the Commission's orders.

*So ordered.*