2007 ME 97

**FPL ENERGY MAINE HYDRO LLC**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION.**

Supreme Judicial Court of Maine.

Argued: Jan. 17, 2007.
Decided: July 26, 2007.

Mathew D. Manahan, Esq., Catherine R. Connors, Esq. (orally), Pierce Atwood LLP, Portland, for plaintiff.

G. Steven Rowe, Attorney General, Gerald D. Reid, Asst. Atty. Gen. (orally), Augusta, for defendant.

Andrew A. Cadot, Esq., Christopher M. Dargie, Esq. (orally), Perkins Thompson, P.A., Portland, for intervenors Maine Rivers, Trout Unlimited, Appalachian Mountain Club and Natural Resources Council of Maine.

James B. Haddow, Esq., Petrucelli, Martin & Haddow, LLP, Portland, for amicus curiae New England Legal Foundation.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, and SILVER, JJ.*

SILVER, J.

[¶ 1] FPL Energy Maine Hydro LLC appeals from a judgment entered in Superior Court (Kennebec County, *Marden, J.*) affirming the Board of Environmental Protection's denial of water quality certification for the Flagstaff Storage Project, owned and operated by FPL. The Board's

---

* Justice Howard H. Dana Jr. sat at oral argument and participated in the initial conference but retired before this opinion was certified.

denial reversed an earlier decision by the Department of Environmental Protection, which certified the Project. FPL argues that (1) because the Board acted after the one-year statutory deadline, either the Department waived certification or the Board's reversal of the Department's determination is ineffective; (2) the Board applied the wrong standard when analyzing the water quality; and (3) the Board erred in concluding that the Flagstaff Project does not meet the Class C water quality standards of 38 M.R.S.A. § 465(4) (2001 & Supp.2003).[1] Because the Board's interpretation of the statute, the statute it is charged with administering, is reasonable, we affirm.

## I. BACKGROUND

[¶ 2] This case concerns the Flagstaff Storage Project, which consists of a dam, known as the Long Falls Dam, a reservoir, called Flagstaff Lake, and appurtenant facilities. The Project is located on the Dead River in Somerset and Franklin counties. Originally constructed between 1948 and 1950, the dam was intended to control flooding, enhance log driving, and generate electricity.

[¶ 3] The Federal Power Commission, now called the Federal Energy Regulatory Commission (FERC), originally licensed the Project to the Central Maine Power Company (CMP) from April 12, 1979, to December 31, 1997. Before expiration of the Project's license, CMP filed two applications: one with the Department to obtain water quality certification, which would allow the Project to continue; and another with FERC requesting a new license for the Project.[2] CMP subsequently withdrew its application to the Department for water quality certification and refiled it once each year between 1997 and 1999.[3] FPL acquired the Project from CMP in 1999.

[¶ 4] FPL continued to refile the application for renewal of the Project until November 15, 2002, when FPL made its final filing. On November 14, 2003, 364 days later, the Department granted water quality certification for the continued operation of the Project. Specifically, when analyzing the aquatic habitat of Flagstaff Lake, the Department found in relevant part that, "[t]he available evidence indicates that the structure and function of the resident biological community in Flagstaff Lake is the structure and function that would be expected to exist in a water storage reservoir with a drawdown of similar magnitude,"[4] and it, therefore, con-

---

1. The Legislature has amended this statute several times since the Department and Board's judgments in this case. Title 38 M.R.S.A. § 465(4)(B) (2001) was amended by P.L.2003, ch. 664, § 1 (effective July 30, 2004) and then repealed and replaced by P.L. 2005, ch. 409, § 2 (effective June 20, 2005). Title 38 M.R.S.A. § 465(4)(C) (2001) was amended by P.L.2005, ch. 182, § 5 (effective Sept. 17, 2005). The current version of the statute is codified at 38 M.R.S. § 465(4) (2006).

2. Pursuant to 33 U.S.C.S. § 1341(a)(1) (2006), no federal license or permit shall be granted until the State, interstate agency, or Administrator, as the case may be, has granted or has waived certification.

3. CMP did this at the request of the Department because a state waives certification if it does not act on an application within one year. See 33 U.S.C.S. § 1341(a)(1).

4. The parties agree that in order to determine whether Flagstaff Lake meets Class C water quality standards, the lake's resident biological community must be assessed against an appropriate baseline. The standard employed by the Department, which compares an impoundment to another impoundment with similar drawdowns, is referred to by the parties as the "impoundment-to-impoundment standard." The two other possible baselines, as described by the parties, are a natural lake, referred to as the "natural-lake standard" or the hydropower impoundment itself, referred

cluded that FPL's proposal for managing water levels would be sufficient to meet applicable water quality standards.

[¶ 5] Subsequent to the certification, a group of non-governmental organizations, including Maine Rivers, Trout Unlimited, Appalachian Mountain Club, and the Natural Resources Council of Maine, filed a timely appeal of the order to the Board. The Town of Eustis, where part of the Dead River is located, also filed an appeal and requested a public hearing.

[¶ 6] On July 15, 2004, the Board issued a judgment, vacating the Department's decision and denying, without prejudice, FPL's application for water certification. The Board found that the Department had employed a new standard for assessing water quality when it used an impoundment-to-impoundment standard, which compares a storage reservoir to another storage reservoir with similar drawdowns.[5] The old standard, referenced by the Board in its decision, is a natural lake standard, which compares a storage reservoir to a natural lake.

[¶ 7] Having found that the Department used a new standard for assessing the water quality of the Project, the Board concluded that in order to obtain certification for this Project under the impoundment-to-impoundment standard, either the

Department has to obtain EPA approval for its new standard or FPL should conduct a use attainability analysis (UAA), a review conducted when a state seeks to create a water sub-classification with less stringent standards. The Board also rejected FPL's argument that, regardless of whether an impoundment-to-impoundment standard applies, the Project meets Class C standards as a matter of law because it does not discharge a pollutant, as required by 38 M.R.S.A. § 465(4)(C) (2001) and 38 M.R.S. § 361–A (2006).[6]

[¶ 8] On August 9, 2004, FPL filed a petition for review of the Board's judgment to the Superior Court. On May 26, 2006, the court entered a judgment affirming the Board's decision to deny water quality certification. The Superior Court concluded that the Board's interpretation of the standard for water quality certification is entitled to deference, and thus, FPL should either obtain EPA approval for its impoundment-to-impoundment standard or it should conduct a UAA to recalibrate the water quality standards for water storage reservoirs. The court also concluded that the federal Water Quality Act requires certification because the Project releases a "discharge," and is, thus, subject to existing water quality standards.

to as the "what-you-see-is-what-you-get standard."

5. Because the Board reversed the Department's decision, the Board found it unnecessary to consider the appeal of the Town of Eustis from that same decision.

6. Specifically, the Board made the following finding:

With respect to the applicant's argument that a hydropower project would by definition meet the standards for resident biological community because there is no discharge of a pollutant, the Board finds that this reading of the law is too narrow and is inconsistent with a long line of FERC, EPA and DEP interpretations of the applicable

laws vested in them. Indeed, the reason that FERC requires water quality certification for the relicensing of this project, and the reason that the Department took action upon it, all as consistent with other, similar projects across the state and the nation, stand as testament to the fact that the law requires certification. The absence of a pollutant does not ensure certification nor does it constitute compliance with the aquatic life standard. Rather, with respect to assessing compliance with the aquatic life standard, the comparison must be, at a minimum, to a "habitat which is free from the discharge of any pollutant."

[¶ 9] While certification was pending at the state level, FERC, the agency in charge of issuing federal licenses, was also taking action on FPL's application for a federal license. On March 30, 2004, after the Department granted certification, FERC issued an order granting FPL a new license for the Flagstaff Project. *FPL Energy Maine Hydro LLC,* 106 FERC ¶ 62,232 (2004). The Appalachian Mountain Club filed a request for rehearing, and while the request was pending, the Board issued its order denying certification. *FPL Energy Maine Hydro LLC,* 108 FERC ¶ 61,261 (2004). On September 21, 2004, FERC stayed its new license application because of the Board's denial of certification. *Id.* FPL filed a request for rehearing and on April 19, 2005, FERC denied FPL's request. *FPL Energy Maine Hydro LLC,* 111 FERC ¶ 61,104 (2005).

[¶ 10] On June 9, 2006, FPL filed a notice of this appeal to us.

## II. STANDARD OF REVIEW

[¶ 11] Generally, "[s]tatutory construction is a question of law, subject to de novo review," however, "[w]hen a dispute involves an agency's interpretation of a statute it administers, the agency's interpretation, although not conclusive, is entitled to great deference and will be upheld unless the statute plainly compels a contrary result." *Town of Eagle Lake v. Comm'r, Dep't of Educ.,* 2003 ME 37, ¶¶ 7–8, 818 A.2d 1034, 1037 (quotation marks omitted). When the statute is ambiguous, we will "review whether the agency's construction is reasonable." *Id.* ¶ 8, 818 A.2d at 1037 (quotation marks omitted).

[¶ 12] When interpreting a statute, we first look to the plain meaning of the text, "to discern from the plain language the real purpose of the legislation, avoiding results that are absurd, inconsistent, unreasonable, or illogical." *Id.* ¶ 7,

818 A.2d at 1037 (quotation marks omitted). If there is an ambiguity in the plain meaning, we then look "beyond that language to the legislative history." *Id.* Finally, we will "consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Id.* (quotation marks omitted).

[¶ 13] "When the Superior Court acts in an intermediate appellate capacity to review an administrative agency's decision pursuant to M.R. Civ. P. 80C, we directly review the agency's decision for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Town of Jay v. Androscoggin Energy, LLC,* 2003 ME 64, ¶ 10, 822 A.2d 1114, 1117.

[¶ 14] When an agency "act[s] as a tribunal of original jurisdiction, that is, as factfinder and decision maker, we review its decision directly." *Stewart v. Town of Sedgwick,* 2000 ME 157, ¶ 4, 757 A.2d 773, 775; *see also Aviation Oil Co. v. Dep't of Envtl. Prot.,* 584 A.2d 611, 614 (Me.1990) (reviewing directly the Board's decision); 38 M.R.S. § 341–D(4)(A) (2006) ("The board is not bound by the commissioner's findings of fact or conclusions of law but may adopt, modify or reverse findings of fact or conclusions of law established by the commissioner."). In this case, the Board made its own findings of fact and conclusions of law; therefore, we review those findings directly and grant deference to the Board.

## III. DISCUSSION

A. The Requirement that the Board "Act on" the Application Within One Year

[¶ 15] Pursuant to 33 U.S.C.S. § 1341(a)(1) (2001), an applicant for federal licensing of an activity that might cause a "discharge" into navigable waters, must

first obtain either water quality certification that the activity complies with federal and state water protection laws, or waiver of such certification, by the state from which the discharge originates. *See S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, ——U.S. ——, 126 S.Ct. 1843, 1846, 164 L.Ed.2d 625 (2006). The state must "act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request." 33 U.S.C.S. § 1341(a)(1). If the state does not "act on" a request within a year, then "the certification requirements . . . shall be waived." *Id.*

[¶ 16] The Department is the agency in Maine responsible for water quality certifications. *S.D. Warren Co.*, 126 S.Ct. at 1847. The Department includes the Board of Environmental Protection and the Commissioner of Environmental Protection. 38 M.R.S. § 341–A(2) (2006). With the exception of certain applications described in 38 M.R.S. § 341–D(2) (2006), the Commissioner makes determinations as to water quality certification. 38 M.R.S. § 344(2–A) (2006). An aggrieved party may appeal the Commissioner's certification judgment to the Board within thirty days of the filing of the Board's decision. 38 M.R.S. § 341–D(4).

[¶ 17] Since the Board's decision was issued more than one year after the application was filed, FPL argues that the Department waived certification or, in the alternative, that the Board's actions after the one-year deadline are ineffective. We

must, therefore, address the section 1341 requirement that a state "act on" an application within one year. Based on our analysis of the legislative history and caselaw, we conclude that the Board complied with the section 1341 requirement that it act on the application within one year.

[¶ 18] Section 1341 does not define "act on" and it is, therefore, unclear from the plain meaning of the statute whether the requirement is one of some action or final action. *See* 33 U.S.C.S. § 1341. Since the statute is ambiguous on its face, we must attempt to discern the legislative intent.

[¶ 19] The legislative history of section 1341 shows that Congress intended to prevent states from effectively denying approval of a project through lengthy delays. In 1969, Congressman Edmonson, the sponsor of this provision, explained that, without the provision, the state "does not have any particular pressure to compel certification," but with the provision the state must "do away with dalliance or unreasonable delay" and vote "a 'yes' or 'no.'" 115 CONG. REC. 9259, 9264 (1969). Congressman Holifield explained that the provision prevents the state from "simply sit[ting] on its hands and do[ing] nothing."[7] 115 CONG. REC. 9259, 9265.

[¶ 20] We have not had occasion to define what constitutes "act[ing] on" a request for certification to meet the one-year requirement. FERC recently considered and rejected FPL's waiver arguments in its federal licensing proceeding for the Flagstaff Project.[8] In its order, FERC

---

7. In full he said:

> [T]his amendment guards against a situation where the water pollution control authority in the State in which the activity is to be located, or possibly in some other State, simply sits on its hands and does nothing. Any such dalliance could kill a proposed project just as effectively as an outright determination on the merits not to issue the required certificate. Thus while this bill would still permit one State to

make a decision that would have extraterritorial effect upon another, at least now it cannot do so passively—it has to take affirmative action to consider the matter and to decide to withhold the certificate if it wants to defeat a proposed project.

115 CONG. REC. 9259, 9265 (1969).

8. FPL also argues that the FERC decision renders this issue moot. We find this argument unpersuasive. Despite "rais[ing] a justiciable controversy at the time the complaint

rejected FPL's arguments that the Department had waived certification by failing to complete the appeal within one year. *FPL Energy Maine Hydro LLC,* 108 FERC ¶ 61,261. The agency held that "[t]here is nothing in the language of Section 401 to suggest that a state must not only act on the certification request but also take action on any appeals that might subsequently be filed within one year." *Id.*

[¶ 21] Although we normally pay deference to an agency's interpretation of a statute, a number of federal courts have held that FERC is not entitled to deference in its interpretation of the Clean Water Act. *See, e.g., Ala. Rivers Alliance v. FERC,* 325 F.3d 290, 296–97 (D.C.Cir. 2003); *Cal. Trout, Inc. v. FERC,* 313 F.3d 1131, 1133–34 (9th Cir.2002); *Am. Rivers, Inc. v. FERC,* 129 F.3d 99, 107 (2d Cir. 1997). Although we do not accord total deference, we look to the FERC decision for cogent analysis.

[¶ 22] FPL relies on a case from the U.S. District Court for the Western District of Washington, *Airport Communities Coalition v. Graves,* 280 F.Supp.2d 1207, 1214–17 (W.D.Wash.2003), which held that where a state board issued a decision on appeal more than one year after the certification request, and the board's decision affirms certification subject to additional conditions, the federal agency "need only incorporate such conditions issued after a year solely in its discretion." The District Court did not hold that the agency's failure to issue a decision on appeal within a year

of the request meant that the certification was deemed waived. *Id.*

[¶ 23] We conclude that the Board's failure to decide the appeal within a year of FPL's initial request for certification does not waive certification or render its decision ineffective. Our analysis of the legislative history indicates a congressional intent that an agency take action on an application within one year. There is no indication, however, that Congress intended for all in-state appeals to be completed within the same one-year deadline. If Congress intended to impose such extreme time pressure, it would have used specific language to that effect. We, thus, agree with the reasoning of FERC and conclude that the Board's actions were timely.

**B. The Baseline Standard for Class C Water Quality**

**1. Deference to the Board's Interpretation**

 [¶ 24] In this case, the Board concluded that "[t]he impoundment-to-impoundment comparison, which compares one disturbed site to a similarly disturbed site, constitutes a dramatic change in the [applicable] Class C [water quality] standard and, as such, legally requires the approval of EPA prior to implementation in accordance with provisions of the federal Clean Water Act." We have held that the Board is entitled to deference in its interpretation of the statutes it is charged with administering. *See, e.g., S.D. Warren Co. v. Bd. of Envt'l Prot.,* 2005 ME 27, ¶ 5,

---

was filed," an appeal is moot "if the passage of time and the occurrence of events deprive the litigant of an ongoing stake in the controversy." *Carroll F. Look Constr. Co. v. Town of Beals,* 2002 ME 128, ¶ 6, 802 A.2d 994, 996 (quotation marks omitted). However, if "sufficient practical effects can flow from the litigation to justify the use of limited judicial resources," then the case is not moot. *Id.*

In this case, FERC only "stay[ed]" the new license ... pending the outcome of any appeal of the certification denial, and reserve[d][its] authority to modify the new license as necessary to incorporate the conditions to any new certification that is issued." *FPL Energy Maine Hydro LLC,* 108 FERC ¶ 61,261 (2004). Thus, further litigation may have an effect on the agency's decision and the issue is not moot.

868 A.2d 210, 214; *Maritime Energy v. Fund Ins. Review Bd.*, 2001 ME 45, ¶ 9, 767 A.2d 812, 814. Since the Board is charged with administering the water quality standards in Maine pursuant to 38 M.R.S.A. § 465 (2001 & Supp.2003), we must grant deference to the Board's interpretation as long as its construction is reasonable. *See Maritime Energy*, 2001 ME 45, ¶ 10, 767 A.2d at 814. "The rationale underlying our deference to [the Board's] interpretations is that the [Board] has greater expertise in matters of environmental concern and greater experience administering and interpreting those particular statutes." *S.D. Warren Co.*, 2005 ME 27, ¶ 5, 868 A.2d at 214. We must, therefore, determine whether the Board's conclusion is reasonable and comports with legislative intent.

2. Plain Meaning of 38 M.R.S.A. § 465(4)

[¶ 25] The first step in statutory interpretation is to discern legislative intent from the plain meaning of the statute. *DaimlerChrysler Corp. v. Executive Dir., Me. Revenue Servs.*, 2007 ME 62, ¶ 9, 922 A.2d 465, 469. Pursuant to the Clean Water Act and its implementing regulations, states are required to designate uses of waterbodies within their borders. 33 U.S.C.S. § 1313 (2001); 40 C.F.R. § 131.10 (2006). Once such designated uses have been established and approved by the EPA, states are permitted to adopt subcategories of use for specific waterbodies, requiring less stringent criteria, provided they conduct a UAA and obtain EPA approval of any subcategory. 40 C.F.R. §§ 131.10(g), (j), 131.20(c) (2006). Class C is Maine's minimum EPA-approved water quality standard for hydropower impoundments and, therefore, under federal law, Maine is not permitted to apply a less stringent standard than Class C to a hydropower impoundment unless a UAA has been conducted and EPA approval has been obtained. *See* 38 M.R.S.A. § 464(9) (Supp.1992); 38 M.R.S.A. § 465(4)(C); 33 U.S.C.S. § 1313; 40 C.F.R. §§ 131.10(g), (j), 131.20(c).

[¶ 26] At the time FPL's certification was pending, the Class C water classification standards provided that "[d]ischarges to Class C waters may cause *some changes to aquatic life,* provided that the receiving waters shall be of sufficient quality to support all species of fish indigenous to the receiving waters and maintain the structure and function of the resident biological community." [9] 38 M.R.S.A. § 465(4)(C)

**9.** Title 38 M.R.S.A. § 465(4) (2001 & Supp. 2003) provided:

§ 465. Standards for classification of fresh surface waters

The department shall have 4 standards for the classification of fresh surface waters which are not classified as great ponds.

. . . .

4. Class C waters. Class C shall be the 4th highest classification.

A. Class C waters must be of such quality that they are suitable for the designated uses of drinking water supply after treatment; fishing; agriculture; recreation in and on the water; industrial process and cooling water supply; hydroelectric power generation, except as prohibited under Title 12, section 403; navigation; and as a habitat for fish and other aquatic life.

B. The dissolved oxygen content of Class C water may be not less than 5 parts per million or 60% of saturation, whichever is higher, except that in identified salmonid spawning areas where water quality is sufficient to ensure spawning, egg incubation and survival of early life stages, that water quality sufficient for these purposes must be maintained. Between May 15th and September 30th, the number of Escherichia coli bacteria of human origin in these waters may not exceed a geometric mean of 142 per 100 milliliters or an instantaneous level of 949 per 100 milliliters. The board shall promulgate rules governing the procedure for designation of spawning areas. Those rules must include provision for periodic review of designated spawning areas and consultation with affected persons pri-

(emphasis added). The Class C standards further provided that the waters "shall be of such quality that they are suitable ... as a habitat for fish and other aquatic life." 38 M.R.S.A. § 465(4)(A).

[¶ 27] The statute creates a hierarchy of standards, with Class AA standards being the highest and Class C standards being the lowest. *See* 38 M.R.S.A. § 465. At the time of certification, the statute provided that Class AA waters "shall be characterized as free flowing and natural,"[10] "[t]he aquatic life, dissolved oxygen and bacteria content ... shall be as naturally occurs,"[11] and "[t]here may be no direct discharge of pollutants to Class AA waters, except storm water discharges." 38 M.R.S.A. § 465(1)(A), (B), (C).

[¶ 28] Based on a plain reading of the statute, it is not clear what baseline was intended for the Class C standards. However, the Board interpreted the baseline to be a "natural lake" standard and such a reading is reasonable based on the language of the statute. The Legislature created a hierarchy of standards, with Class AA being the highest and Class C being the lowest. Since Class AA standards require "natural" conditions, it is reasonable to read all other standards as measured against the Class AA baseline. We must next examine the legislative history of section 465 to determine whether the Board's interpretation is aligned with the Legislature's intent and is reasonable pursuant to the statute's history.

### 3. Legislative History

[¶ 29] FPL contends that there are three events in the legislative history of 38 M.R.S. § 464, which demonstrate legislative intent that the baseline standard for Class C waters be the "impoundment-to-impoundment" standard, rather than the "natural lake" standard. FPL points to the March 1992 amendment of the statute, the legislative resolve passed in May 2003, and Maine's antidegradation law. We examine each in turn.

### 4. The March 1992 Amendment

[¶ 30] In March 1992, the Legislature amended the water classification laws by enacting 38 M.R.S.A. § 464(9) (Supp.1992) to provide that Maine's hydropower impoundments comply with the certification standards if "[t]he existing impounded waters are able to support all species of fish indigenous to those waters and the structure and function of the resident biological community in the impounded waters is maintained." P.L.1991, ch. 813, § A–1 (effective June 30, 1992). According to the parties, this standard became known as the "what-you-see-is-what-you-get" standard because it attempted to maintain the status quo for Maine's hydropower impoundments.

[¶ 31] On January 14, 1993, the EPA formally disapproved of 38 M.R.S.A. § 464(9) as amended, explaining that it is inconsistent with federal requirements because it attempts to create a new subcategory without requiring a UAA and provid-

---

or to designation of a stretch of water as a spawning area.

 C. Discharges to Class C waters may cause some changes to aquatic life, provided that the receiving waters shall be of sufficient quality to support all species of fish indigenous to the receiving waters and maintain the structure and function of the resident biological community.

**10.** Title 38 M.R.S. § 466(9) (2006) defines "[n]atural" as "living in, or as if in, a state of

nature not measurably affected by human activity."

**11.** "As naturally occurs" is defined as "conditions with essentially the same physical, chemical and biological characteristics as found in situations with similar habitats free of measurable effects of human activity." 38 M.R.S. § 466(2) (2006).

ing for public participation.[12] As a result of the EPA's disapproval, the Legislature amended the statute to apply the "what-you-see-is-what-you-get" standard to only one impoundment, the Ripogenus impoundment, because a UAA had been conducted for that impoundment. *See* P.L. 1993, ch. 344, § 2 (effective Oct. 13, 1993) (codified at 38 M.R.S.A. § 464(9) (Supp. 1992)). The amendments made clear that Class C water quality standards apply to all other hydropower impoundments. *Id.* Title 38 M.R.S.A. § 464(9), effective at the time of the Commissioner's certification in this case, contained identical language to the statute as amended in 1993.

[¶ 32] FPL contends that the 1992 amendments to section 464 show that the legislative intent has always been to compare hydropower impoundments to impoundments rather than natural lakes. We do not view this history as FPL does. The events in 1992 reflect an attempt by the Legislature to impose lower standards

without following the proper procedures. The EPA's express disapproval of the Legislature's actions in 1992 shows that such standards were a departure from the norm. Furthermore, the standard proposed in 1992, which required a comparison between an impoundment and itself, is a different standard from the "impoundment-to-impoundment" standard at issue now. This history does not undermine the Board's conclusion that the "impoundment-to-impoundment" standard is a new standard requiring EPA approval.

5. The 2003 Resolve

[¶ 33] In May 2003, the Legislature passed a Resolve, which directed the Department to "adopt rules" requiring that "the structure and function ... that must be maintained in a water storage reservoir is the structure and function that would be expected to exist in a water storage reservoir with a drawdown of similar magnitude."[13] L.D. 1059 (121st Legis.2003).

**12.** Prior to this formal disapproval, the EPA sent a letter to the Department on May 19, 1992, communicating its concern that 38 M.R.S.A. § 464(9) (Supp.1992), as amended, would not meet federal requirements. Attached to the letter, the EPA provided its "[r]eview and [a]nalysis" of the new statute, which stated:

[The] EPA could approve the legislation if it is only clarifying that for all existing GPA hydropower impoundments, including those with significant level fluctuations, that the Class GPA "natural" aquatic life criteria are not applicable but that the impoundment must meet the minimum requirement of the Class C aquatic life criteria.... Moreover, Part A may be acceptable *even if* it creates a new subcategory of Class C which goes below the minimum aquatic life criteria of Class C, *provided that* the provision is found, by the State Attorney General, to require the State to follow the necessary federal procedures before a waterbody is placed into this new subcategory.... Under federal law, before the State can move an impoundment into this new subcategory, it must first provide the neces-

sary justification (i.e., UAA) and opportunity for public participation.
(Emphasis in original.)

**13.** The Legislature's Resolve stated in full:

Sec. 1 Water storage reservoirs; rules. Resolved: That the Department of Environmental Protection, Board of Environmental Protection shall adopt rules under the Maine Revised Statutes, Title 38, section 464, subsection 5 relating to protocols and procedures for evaluation of the resident biological community in water storage reservoirs. In adopting the rules, the Board of Environmental Protection shall recognize that water storage reservoirs are artificial and are not natural water bodies, and the rules must ensure that the existing uses of water storage reservoirs are maintained and protected. In issuing licenses, permits and certifications prior to final adoption of the rules, the Department of Environmental Protection shall recognize that water storage reservoirs are artificial and are not natural water bodies and shall ensure that the existing uses of water storage reservoirs are maintained and protected. The goal of

The Resolve defined water storage reservoir as "an impoundment associated with a hydropower project."

[¶ 34] Pursuant to 38 M.R.S. § 342(9) (2006), the Commissioner of the Department "may submit to the board new or amended rules for its adoption." It is the Board, however, that has final authority to adopt a new rule pursuant to 38 M.R.S. § 341-D(1-B) (2006).[14] Following the passage of the 2003 Resolve, the Commissioner drafted an order granting water quality certification to the Flagstaff Project, using the criteria articulated in the Resolve.

[¶ 35] On November 10, 2003, the EPA sent a letter to the Department disapproving of the Commissioner's use of this standard because "this new legislation is not in effect for federal law purposes and cannot be relied upon for [the Clean Water Act] certification." The EPA wrote "[the Department] now asserts that, rather than comparing a storage reservoir to a natural lake as it has done since 1995, [the Depart-

ment] is now adopting the policy (at least orally) that storage reservoirs shall be compared to other impoundments with similar drawdowns."

[¶ 36] FPL contends that the 2003 Resolve indicates clear legislative intent that the impoundment-to-impoundment standard is, and has always been, the appropriate standard to determine compliance with Class C water quality standards pursuant to 38 M.R.S.A. § 465(4). Although we agree with FPL that the Resolve indicates legislative intent that the impoundment-to-impoundment standard apply now, we see no reason why the Legislature would issue a resolve directing the Commissioner to "adopt rules" if such a standard already existed. The 2003 Resolve demonstrates the Legislature's intention to promulgate a new rule. However, because of the EPA's disapproval, a new rule was not adopted.

### 6. The Antidegradation Law

[¶ 37] Also effective in 2003 was Maine's antidegradation law, 38 M.R.S. § 464(4)(F) (2006),[15] which provides that "[e]xisting in-

---

the rules and any license, permit or certification must be to require that the structure and function of the resident biological community that must be maintained in a water storage reservoir is the structure and function that would be expected to exist in a water storage reservoir with a drawdown of similar magnitude. As used in this resolve, "water storage reservoir" means an impoundment associated with a hydropower project, as defined by Title 38, section 632, that was in existence prior to November 28, 1975, was not primarily lacustrine in its natural state, is classified under Title 38, section 465-A and is managed to store and release water on an annual cycle to benefit downstream hydropower generation.

**14.** Title 38 M.R.S. § 341-D(1-B) (2006) states:

§ 341-D. Board responsibilities and duties

. . . .

1-B. Rulemaking. Subject to the Maine Administrative Procedure Act, the board shall adopt, amend or repeal reasonable

rules and emergency rules necessary for the interpretation, implementation and enforcement of any provision of law that the department is charged with administering. The board shall also adopt, amend and repeal rules as necessary for the conduct of its business.

(Footnote omitted.)

**15.** Title 38 M.R.S. § 464(4)(F) (2006) provides in relevant part:

4. General provisions. The classification system for surface waters established by this article shall be subject to the following provisions.

. . . .

F. The antidegradation policy of the State is governed by the following provisions.

(1) Existing in-stream water uses and the level of water quality necessary to protect those existing uses must be maintained and protected. Existing in-stream water uses are those uses which have actually occurred on or after November 28, 1975, in or on a water body whether or not the

stream water uses and the level of water quality necessary to protect those existing uses must be maintained and protected." The statute defines an "existing in-stream water use" to include "[t]he use of the water body for … water supply, or commercial activity that depends directly on the preservation of an existing level of water quality." 38 M.R.S. § 464(4)(F)(1)(d). The antidegradation law requires an applicant seeking protection as an "existing in-stream use" to "demonstrate[ ] that the proposed activity would not have a significant impact on the existing use" in order to obtain water quality certification pursuant to the Clean Water Act. 38 M.R.S. § 464(4)(F)(1–A)(a).

[¶ 38] We do not interpret Maine's antidegradation law as exempting the Project from the requirements of the Clean Water Act simply because the Project is an existing in-stream use. Instead, 38 M.R.S. § 464(4)(F)(1–A) provides an additional requirement that must be met in order for FPL to obtain water quality certification pursuant to the Clean Water Act.

[¶ 39] This history demonstrates legislative attempts to change the baseline standard against which hydropower impound-

uses are included in the standard for classification of the particular water body. Determinations of what constitutes an existing in-stream water use on a particular water body must be made on a case-by-case basis by the department. In making its determination of uses to be protected and maintained, the department shall consider designated uses for that water body and:

(a) Aquatic, estuarine and marine life present in the water body;

(b) Wildlife that utilize the water body;

(c) Habitat, including significant wetlands, within a water body supporting existing populations of wildlife or aquatic, estuarine or marine life, or plant life that is maintained by the water body;

(d) The use of the water body for recreation in or on the water, fishing, water supply, or commercial activity that depends directly on the preservation of an existing level of water quality. Use of the water body to receive or transport waste water discharges is not considered an existing use for purposes of this antidegradation policy; and

(e) Any other evidence that, for divisions (a), (b) and (c), demonstrates their ecological significance because of their role or importance in the functioning of the ecosystem or their rarity and, for division (d), demonstrates its historical or social significance.

(1–A) The department may only issue a waste discharge license pursuant to section 414–A, or approve a water quality certification pursuant to the United States Clean Water Act, Section 401, Pub-

lic Law 92–500, as amended, when the department finds that:

(a) The existing in-stream use involves use of the water body by a population of plant life, wildlife, or aquatic, estuarine or marine life, or as aquatic, estuarine, marine, wildlife, or plant habitat, and the applicant has demonstrated that the proposed activity would not have a significant impact on the existing use. For purpose of this division, significant impact means:

(i) Impairing the viability of the existing population, including significant impairment to growth and reproduction or an alteration of the habitat which impairs viability of the existing population; or

(b) The existing in-stream use involves use of the water body for recreation in or on the water, fishing, water supply or commercial enterprises that depend directly on the preservation of an existing level of water quality and the applicant has demonstrated that the proposed activity would not result in significant degradation of the existing use.

The department shall determine what constitutes a population of a particular species based upon the degree of geographic and reproductive isolation from other individuals of the same species.

If the department fails to find that the conditions of this subparagraph are met, water quality certification, pursuant to the United States Clean Water Act, Section 401, Public Law 92–500, as amended, is denied.

(Footnotes omitted.)

ments are to be judged, however, it does not support FPL's contentions that the "impoundment-to-impoundment" standard has always been the applicable standard. We conclude that based on the legislative history, the Board's judgment that the "impoundment-to-impoundment" standard represents a "dramatic change from past practice" and, thus requires EPA approval, is reasonable. We, therefore, defer to the Board's expertise and affirm its conclusion.

## C. Compliance with Class C Standards

[¶ 40] FPL finally argues that the Project meets the definition of Class C water quality standards under 38 M.R.S.A. § 465(4)(C) because the Project does not discharge pollutants. The Board found this interpretation of the statute "too narrow" and "inconsistent with a long line of FERC, EPA and [Department] interpretations of the applicable laws vested in them."

[¶ 41] The Class C water quality standards provide that "[d]ischarges to Class C waters may cause some changes to aquatic life." 38 M.R.S.A. § 465(4)(C). Title 38 M.R.S. § 361–A(1) (2006) defines "discharge" to mean "any spilling, leaking, pumping, pouring, emptying, dumping, disposing or other addition of any pollutant to water of the State." Title 38 M.R.S. § 361–A(4–A) (2006) defines "[p]ollutant" as "dredged spoil, solid waste, junk, incinerator residue, sewage, refuse, effluent,

garbage, sewage sludge, munitions, chemicals, biological or radiological materials, oil, petroleum products or by-products, heat, wrecked or discarded equipment, rock, sand, dirt and industrial, municipal, domestic, commercial or agricultural wastes of any kind." [16]

[¶ 42] We once again defer to the Board's expertise in interpreting this provision. The Board found FPL's argument unpersuasive because "this reading of the law is too narrow and is inconsistent with a long line of FERC, EPA and [Department] interpretations of the applicable laws vested in them." The Board's interpretation is reasonable because, without the discharge requirement, the Class C certification process for hydropower impoundments would be no more than rubber stamp approval. *See, e.g., S.D. Warren Co.,* 2005 ME 27, ¶ 17, 868 A.2d at 217 (interpreting the term "discharge" in the Clean Water Act to include the "addition" of water from one body to another), *aff'd,* —— U.S. ——, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006).

[¶ 43] Because we defer to the agency interpretation, and the Board's findings are reasonable, we affirm the Board's decision.

The entry is:

Judgment affirmed.

---

16. We note that the definition of "[p]ollutant" includes "sand [and] dirt." Generally the water flowing into hydropower impoundments is filled with sand and/or dirt that gets trapped in the impoundment, thus increasing the levels of these "pollutants" in the water. However, since the Department does not make this argument, we do not address its merits.