STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-AP-13-01

AMH-CUM- 10/4/2013

✓

DOUGLAS H. WATTS,

Petitioner,

v.

MAINE BOARD OF
ENVIRONMENTAL PROTECTION,

Respondent,

and

S.D. WARREN COMPANY,

Party-in-Interest

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## DECISION ON 80C APPEAL

Petitioner Douglas H. Watts appeals from the November 15, 2012, Decision of the Board of Environmental Protection (the Board) that affirmed the approval of a water quality certification for the Eel Weir Hydropower Project on Sebago Lake owned by the S.D. Warren Company (Warren). *See* 5 M.R.S. § 11001 (2012); 38 M.R.S. § 346 (2012); M.R. Civ. P. 80C. (Administrative Record (hereinafter "A.R.") 1919 (hereinafter, "Decision").)[1] Petitioner asserts numerous legal challenges to the Board's decision regarding the Eel Weir Hydropower Project (Project). Because Petitioner only challenges certain portions of the Decision, the Court begins with the procedural history of this matter and addresses relevant portions of the Decision in the context of Petitioner's arguments.

---

[1] The court permitted the Board to submit the Administrative Record in this matter electronically. The operative decision is within document number 1919, at the electronic pagination of 19 through 59. The Court refers to the November 15, 2012, Decision by its internal pagination. Future citations to the record will be by document number and then by electronic pagination, when necessary.

1

*PROCEDURAL BACKGROUND*

Warren own the Project, "which is located at the outlet of Sebago Lake and controls water levels in Sebago Lake and flows in the downstream Presumpscot River." (Decision 1.) The Project includes a dam, an impoundment (Sebago), a power canal, a powerhouse, tailrace channel, a bypass reach (Eel Weir Bypass or Bypass), and other facilities. (Decision 1.) A dam has existed at this site since at least 1827. (Decision 1.) The Federal Energy Regulatory Commission (FERC) licensed the Project in 1984 for a 20-year term. (Decision 1.) Amendments to the license have established minimum flow requirements in the Bypass and a lake management plan. (Decision 1.)

In 2002, Warren filed an application with the Department for a water quality certification (WQC) in conjunction with the proposed FERC relicensing of the project. (Decision 1.) The application was withdrawn and refiled each year by Warren, with the last filing in January of 2011.[2] (Decision 1.) By order dated August 30, 2011, the Department issued a final order approving the WQC for the Project. (Decision 2; A.R. 1840.) Petitioner initially filed an appeal of the Department's order to the Superior Court pursuant to M.R. Civ. P. 80C. The Superior Court remanded the matter to the Board for its consideration. *Petitioner v. Me. Dep't of Envtl. Prot.*, KEN-AP-11-54 (Me. Super. Ct., Ken. Cty., March 3, 2012) (Murphy, J.). (A.R. 1864 at 4.) The Board reviewed the appeal without hearing,[3] based on the record alone, and issued the subject order on November 15, 2012. (Decision 4.) Petitioner filed a timely petition for review in Kennebec County Superior Court on December 14, 2012. The

[2] States have one year from the filing of an application for water certification to issue or deny a WQC. *See* 33 U.S.C.A. § 1341(a)(1) (West, Westlaw through P.L. 113-36 (excluding P.L. 113-34)); *FPL Energy Me. Hydro LLC v. Dep't of Env'l Prot.*, 2007 ME 97, ¶ 15, 926 A.2d 1197. As noted by the Board in its opposition, because major projects often take longer than year, the applicant will often withdraw and refile its application to provide for meaningful review.

[3] A participant in the administrative process that is not a party to the present appeal requested a hearing. (Decision 4.) The Board has discretion to conduct a hearing or not and elected not to in this case. *See* 38 M.R.S. § 341-D(4) (2012).

matter was transferred to the Business and Consumer Court on January 14, 2013. The Court heard oral argument on the appeal on July 31, 2013.

## DISCUSSION

### I.    STANDARD OF REVIEW

In an 80C appeal of an agency's decision, the court may affirm the decision, 5 M.R.S. § 11007(4)(A) (2010), remand for further proceedings, 5 M.R.S. § 11007(4)(B) (2010), or:

> [r]everse or modify the decision if the administrative findings, inferences, conclusions or decisions are:
>
> **(1)**  In violation of constitutional or statutory provisions;
> **(2)**  In excess of the statutory authority of the agency;
> **(3)**  Made upon unlawful procedure;
> **(4)**  Affected by bias or error of law;
> **(5)**  Unsupported by substantial evidence on the whole record; or
> **(6)**  Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S. § 11007(4)(C) (2010); *accord Goodrich v. Me Pub. Emps. Ret. Sys.*, 2012 ME 95, ¶ 6, 48 A.3d 212. The court will "not attempt to second-guess the agency on matters falling within its realm of expertise" and judicial review is limited to "determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering, Inc. v. Sup't of Ins.*, 593 A.2d 1050, 1053 (Me. 1991). The party seeking to vacate the agency's decision has the burden of proving the agency's decision is clearly erroneous. *Douglas v. Bd. of Trs. of the Me. State Ret. Sys.*, 669 A.2d 177, 179 (Me. 1996). A court will not overturn the agency's fact-finding unless the party seeking to overturn the agency's decision demonstrates that the administrative record compels a contrary result "to the exclusion of any other inference." *Id.* at 179.

Finally, with respect to interpretation, a court will interpret a statute according to its plain meaning, without examining legislative history or giving deference to the Board's construction. *See Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, ¶¶ 22-23, 895 A.2d 309;

3

*Dombkowski v. Ferland*, 2006 ME 24, ¶ 22, 893 A.2d 599 (explaining that the court's ultimate objective when interpreting a statute is to "effectuate the intent of the Legislature, which is ordinarily gleaned from the plain language of the statute"). In doing so, a court will consider the language in the context of the whole statutory scheme and construe the statute to avoid absurd, illogical, or unreasonable results. *See FPL Energy Me. Hydro LLC*, 2007 ME 97, ¶ 12, 926 A.2d 1197.

II.   ANALYSIS

A.   Water quality standards: 5 M.R.S. § 11007(4)(C)(1)

Petitioner makes numerous legal challenges to the Board's order, but one overarching argument is Petitioner's interpretation of the water quality standards and what constitutes a "natural" habitat for indigenous fish. Maine's water quality standards classify the segment of the Presumpscot River below the Dam as Class A, *see* 38 M.R.S. § 467(9)(A)(1) (2012), and Sebago Lake as GPA, *see* 38 M.R.S. § 465-A(1) (2012). The Class A standard is as follows:

> Class A waters must be of such quality that they are suitable for the designated uses of drinking water after disinfection; fishing; agriculture; recreation in and on the water; industrial process and cooling water supply; hydroelectric power generation, except as prohibited under Title 12, section 403; navigation; and as habitat for fish and other aquatic life. The habitat must be characterized as natural.

38 M.R.S. § 465(2)(A) (2012). The GPA standard relevant to Petitioner's arguments is as follows:

> Class GPA waters must be of such quality that they are suitable for the designated uses of drinking water after disinfection, recreation in and on the water, fishing, agriculture, industrial process and cooling water supply, hydroelectric power generation, navigation and as habitat for fish and other aquatic life. The habitat must be characterized as natural.

38 M.R.S. § 465-A(1)(A) (2012). Finally, the parties agree that because Class A and Class GPA are intended to be more protective than Class C standards, the Class standards are implicitly applicable to water bodies. Relevant here is the Class C standard that requires waters to "be of

4

sufficient quality to support all species of fish indigenous to the receiving waters." 38 M.R.S. § 465(4)(C) (2012).

As the BEP points out in its brief, the Class A and Class GPA standards designate different and competing uses of the water bodies, including drinking water, fishing, habitat for fish and other aquatic life, recreation, and hydroelectric power generation. 38 M.R.S. § 465(2)(A); 38 M.R.S. § 465-A(1)(A). It is the role of the Department and the Board to ensure that all of these uses designated by the Legislature are present in a body of water, or take steps to enhance the water quality so that they may be achieved. *See S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 21, 868 A.2d 210. Relevant to Petitioner's arguments, both standards also state: "The *habitat* must be characterized as natural." 38 M.R.S. § 465(2)(A) (emphasis added); 38 M.R.S. § 465-A(1)(A) (emphasis added). "Natural" is a defined term, which "means living in, or as if in, a state of nature not measurably affected by human activity." 38 M.R.S. § 466(9) (2012).

Underlying many of Petitioner's arguments is Petitioner's incorrect interpretation of the combined term, "natural" habitat. Petitioner incorrectly asserts that "natural" means a body of water untouched by human activity, essentially in a pre-dam condition. The Court disagrees with Petitioner and agrees with the Board on this point. As the Board concluded and repeatedly explained in the Decision, "natural" applies to the habitat and not to the water body. (Decision 9, 13, 27.) Thus, what the law contemplates in effect is that the permitted uses of Class A waters must not cause the habitat to be measurably affected by the human activity associated with those uses. Petitioner's arguments would, in effect, reclassify the river to Class AA, *see* 38 M.R.S. § 465(1) (2012), rather than the designated Class A standard, and would also read the enumerated permitted uses out of the Class A standard.

5

Finally, the Department must consider all of the designated uses of the water bodies, seeking "a balance that maintains all statutory goals, even if there are perceived conflicts between uses." (Decision 10.) The Court agrees with the Board's interpretation of the water quality standards.

B.      Fish passage: 5 M.R.S. § 11007(4)(C)(1)

Petitioner first asserts that the Board erred by not requiring the immediate installation of a passage for all types of anadromous fish at the Eel Weir Dam, rather than a passage for only juvenile eels. Anadromous fish "are those that migrate from the ocean to fresh water to spawn." (Decision 24.) Petitioner is primarily concerned with freshwater salmon that inhabit Sebago Lake. In support of this assertion of error, Petitioner contends that the Clean Water Act and Maine's water quality standards require that native fish be able to live in a self-sustaining condition. Next, Petitioner argues that the Board erred by delegating its authority to the Maine Department of Inland Fisheries and Wildlife (MDIFW). Petitioner further contends that the Decision unlawfully discriminates against the salmon in favor of the eels and in violation of the Clean Water Act. Petitioner asserts that the lack of passage for salmon violates the anti-degradation clause, 38 M.R.S. § 464(4)(F)(1). Finally, Petitioner argues that relevant case law requires fish passage for the salmon.

1.    *Self-sustaining condition*

Petitioner asserts that the Class A and Class C water standards require native fish to be in a self-sustaining condition. As explained above, the Class A standards only require the habitat to "natural"; the Class A standards do not require fish populations to be self-sustaining. (Decision 23, 25.) Petitioner points to no other authority for his assertion that fish populations must be self-sustaining. Indeed, the record shows that the salmon population in question is not

self-sustaining; the salmon population is supported by stocking. The Court sees no error in the Board's decision on this point.

2. *Delegation of authority*

Petitioner asserts that the Board delegated its authority to the MDIFW on the fish passage issue, that is, instead of determining whether the water quality standards required the installation of a fish passage, the Board adopted the preference of the MDIFW. The Board addressed this argument in its decision:

> The Board finds that, while the Department's determinations regarding fish passage are not controlled by the fisheries agencies, the Department necessarily relies on these agencies for their expert opinion regarding the suitability of ecological conditions to support indigenous species, including the interaction of different species in the context of fishery management objectives. However, the final decision on compliance with water quality standards rests with the Department.

(Decision 25.) The Court sees no evidence of the Board delegation to the MDIFW on this issue. Rather, the Board appropriately took into account the expertise of the MDIFW and the evidence submitted by MDIFW in determining whether the project complied with the water quality standards. (A.R. 1222.)

3. *Discrimination amongst species*

The Board concluded, based on evidence in the record, that self-sustaining populations of American eel are present in the Bypass and the Lake, both above and below the Eel Weir Project. (Decision 26.) Because the American eel is of considerable interest to both state and federal agencies, the Board concluded both upstream and downstream passage for the eels was required to support their habitat. (Decision 26.)

Petitioner does not challenge this finding outright. Petitioner asserts that the Board, however, is discriminating against salmon and in favor of eels. Petitioner argues that relevant

7

state and federal laws require the immediate installation of a fish passage for *all* fish, not just the eel and that the EPA has stated that species-specific discrimination is not permitted.

The Court agrees with the Board that Petitioner has mischaracterized the EPA's letter regarding alewives. Notably, the law at issue in the EPA letter has been repealed by the Legislature. *See* P.L. 2013, ch. 47 (effective April 24, 2013). Moreover, the present situation is distinct from that involving the alewives because of the factual findings of the Board. The Board found that while the salmon were not a self-sustaining population, the eels were. (Decision 17-18, 26.) Its decision was based on a factual distinction between the two populations, not unlawful discrimination between species.

### 4. *Anti-degradation clause*

Petitioner argues that the certification violates the anti-degradation clauses because salmon have dropped into the Bypass; thus, Petitioner argues, not allowing the salmon to continue into the river equates to backsliding an existing use in violation of the policy. The statute provides:

> Existing in-stream water uses and the level of water quality necessary to protect those existing uses must be maintained and protected. Existing in-stream water uses are those uses which have actually occurred on or after November 28, 1975, in or on a water body whether or not the uses are included in the standard for classification of the particular water body.

38 M.R.S. § 464(F)(1) (2012).

First, the Court is not convinced that this argument has been preserved, as it does not appear to have been presented to the Board. *See New Eng. Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife*, 550 A.2d 56, 58 (Me. 1988). Nevertheless, the Court agrees with the Board's brief that while the certification does not further the opportunity for salmon to drop into the Bypass, the WQC also does not do anything to prevent the salmon from doing so. The

8

Court sees no violation of the anti-degradation policy, in that the salmon will still be able to drop down into the Bypass, consistent with current circumstances.

### 5.  Law Court precedent

Finally, Petitioner asserts that the Law Court, in a series of cases, has already determined that "native fish must be able to conveniently pass and repass at the dams built across" the Presumpscot River.  Petitioner specifically cites *S.D. Warren Co. v. Board of Environmental Protection*, 2005 ME 27, 868 A.2d 210, for this proposition.  Petitioner's argument is based on a misunderstanding of that decision, which does not stand for the proposition asserted.  The Board's decision is not inconsistent with the *Warren* decision or any other Law Court precedent identified by the Petitioner.

### C.  River flows: 5 M.R.S. § 11007(4)(C)(1)

Petitioner next argues that the artificial diversion of the river into a bypass violates Class A standards because there is not enough water and thus not enough oxygen to support a natural fish habitat.  Here, Petitioner focuses on the Class B requirement that the habitat be "unimpaired," which is defined as being "without a diminished capacity to support aquatic life." 38 M.R.S. § 466(11) (2012).  Petitioner asserts that the Department and Board used the improper baseline to evaluate the river flow and that the flow in the bypass does not meat the Class B standard, and thus cannot meet the Class A standard.

Petitioner's challenge suffers from the same misinterpretation of the water quality standards as previously noted.  Petitioner is in effect applying the Class AA standard of "free flowing" habitat to the Class A setting.  *Cf.* 38 M.R.S. § 465(1)(A) (2012) (designating the Class AA standard of habitat as "free flowing").  As noted above, the Class A standard requires the habitat to be "natural," i.e., "living in, or as if in, a state of nature not measurably affected by human activity." 38 M.R.S. § 466(9).  In addition, hydroelectric power is a designated use of

9

the Class A standard. 38 M.R.S. § 465(2)(A). Any consideration of the river flow must be examined in light of that designated use. Although Petitioners challenges the methodology utilized, the Board was within its discretion to utilize the methodology selected. The record amply supports the Board's conclusion.

D.    Lake levels:  5 M.R.S. § 11007(4)(C)(1)

Petitioner next challenges the lake levels by essentially making the same arguments as made to challenge the river flows, which suffer from the same fatal flaws. Incorporating the analysis addressing the river flows, the Court likewise concludes that the Board's decision on the lake levels is supported by the record and contains no error of law.

E.    Outflow cap:  5 M.R.S. § 11007(4)(C)(1) &

Petitioner's final challenge is to the WQC's outflow cap, which limits the outflows to 1,000 cfs or less during from mid-October to mid-November each year. The purpose of the outflow cap is to discourage the landlocked salmon from migrating through the Bypass to spawn, thus increasing the likelihood that salmon will return to the Jordan River collection site which supports the salmon fishery. (Decision 27.) The outflow cap will thus further the MDIFW agency's objectives for its landlocked salmon fishery. Petitioner asserts that the cap will prevent the salmon from behaving "naturally," that is, migrating downstream to their historic habitat to spawn.

Again, Petitioner misconstrues the requirement that the fish habitat be "natural" to satisfy the water quality standards. Moreover, discouraging salmon from migrating downstream will promote the fishery and the use of the water bodies for fishing, as required by the water class standards. 38 M.R.S. § 465(2)(A); 38 M.R.S. § 465-A(1)(A). The Court discerns no error in the Board's decision on this point.

10

*CONCLUSION*

Based on the foregoing, the court concludes that the Board committed no error in interpreting Maine's water quality standards. The Decision is supported by sufficient record evidence. Accordingly, the court affirms the November 15, 2012, Decision of the Board of Environmental Protection and denies the appeal.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Order into the docket by reference.

Dated October 3, 2013

A.M. Horton
Justice, Maine Business & Consumer Court

Entered on the Docket: 10.4.13
Copies sent via Mail ___ Electronically ✓

11

**BCD-AP-13-01**


**Douglas H. Watts,**

                    Petitioner,

        v.

**Maine Board of
Environmental Protection,**

                    Respondent,


and


**S.D. Warren Company,**

                    Party-in-Interest


**Douglas H. Watts, Pro Se**
131 Cony Street
Augusta, ME 04330


**Maine Board of Environmental Protection**
Gerald Reid, AAG
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006


**S.D. Warren Company**
Matthew D. Manahan, Esq.
Pierce Atwood, LLP
254 Commercial Street
Portland, ME 04101