2010 ME 9

**Bryan A. SMITH**

v.

**CENTRAL MAINE POWER CO.**

Supreme Judicial Court of Maine.

Argued: Sept. 16, 2009.
Decided: Feb. 9, 2010.

Catherine R. Connors, Esq. (orally), Hallie F. Gilman, Esq., Pierce Atwood LLP, Portland, ME, for Central Maine Power Company.

Barry K. Mills, Esq. (orally), Hale & Hamlin, LLC, Ellsworth, ME, Lisa Cohen Lunn, Esq., Vafiades, Brountas & Kominsky, LLP, Bangor, ME, for Bryan A. Smith.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SAUFLEY, C.J.

[¶ 1] Bryan A. Smith suffered severe electrical injuries while he was working for Devereux Marine, Inc., when a sailboat mast he was moving made contact with a Central Maine Power Company line along

Route 166 in the Town of Penobscot. Smith received workers' compensation benefits from Devereux and separately filed suit against CMP, alleging that CMP negligently caused his injuries by allowing its power lines to be strung too low. Following a bench trial, the Superior Court (Penobscot County, *Murphy, J.*) found that Smith's injuries resulted from CMP's negligence and awarded Smith damages in the amount of $4,890,631. CMP appeals, and we affirm the judgment.

## I. FACTUAL FINDINGS AND PROCEDURAL HISTORY

[¶ 2] The following factual findings are supported by competent evidence in the record. *See In re Beauchene*, 2008 ME 110, ¶ 7, 951 A.2d 81, 84. Devereux Marine is a private marina whose customers are members of the public. Devereux rigs its customers' sailboats for launching and unrigs them for storage and repair at its three-acre boatyard in the Town of Penobscot. The 19.9–kV CMP power line involved in this accident runs along Route 166, which divides the boatyard into a two-acre western portion and a one-acre eastern portion. Smith's accident occurred on the western portion, which is bounded on the east by Route 166 and the power line, and on the west by Devereux's launching ramp and Penobscot Bay—a body of water of more than 2,000 acres.

[¶ 3] As of 1951, CMP had installed power lines along Route 166. These lines were, and remain, within a public right-of-way. In early 1989, one of the operators of Devereux went to a CMP office to discuss raising the line along Route 166 so that Devereux could move boats back and forth across the road. CMP represented that it would do the work only if Devereux paid the costs, which Devereux was unable

to afford. Sometime later, the line along Route 166 was raised to enable a specialized boat lift to pass beneath it.

[¶ 4] In 1998, the backstay of a sail mast made contact with the power line while a boat was being backed from Devereux's launch toward Route 166. No one was injured; however, electrical service was disrupted, and CMP had to restore power.

[¶ 5] On October 31, 2002, Smith, a Devereux employee, was lowering a mast from a sailboat when the mast made contact with the power line, which was thirty feet off the ground. He was severely burned and suffered significant permanent injuries. Smith received workers' compensation benefits from Devereux[1] and sued CMP for negligence.

[¶ 6] After considering the evidence admitted during the trial of the negligence claim, and after conducting a view of the boatyard and power line, the court made extensive findings. The court found that Devereux was operating as a marina with an "[e]stablished boat ramp[ ] and associated rigging area[ ]" and that the boatyard was an area that, by use, was "intended to be used by the public for rigging or launching sailboats." 9 C.M.R. 65 407 910–2, § 1(A) (2001); Inst. of Electrical and Electronics Engineers, Inc., *National Electrical Safety Code C2–2002*, Table 232–1(7), (8), at 77–78 (2002 ed. 2001) (NESC Table 232–1). Accordingly, the court found that Public Utilities Commission rules imposed a 45.5–foot vertical clearance requirement for the power lines along Route 166. *See* 9 C.M.R. 65 407 910–2, §§ 1–3 (2001); NESC Table 232–1(7), (8). The court further found that the accident would not have occurred if CMP had met the Commission's 45.5–foot vertical clearance requirement and that the

negligence of Devereux as Smith's employer was not the sole proximate cause of the accident. The court noted that "[i]f the law allowed these lines to have a vertical clearance of 30 feet, the Court might reach a different conclusion, but the law required the lines to have a 45.5 foot vertical clearance."

[¶ 7] The court also found that CMP's company policy is to make its employees responsible for the safety of all people near electrical lines, not just its own employees. CMP trained its employees regarding the Overhead High-voltage Line Safety Act's prohibition against performing work that would cause a person or certain equipment or items, including boat masts, to be brought within ten feet of a power line. *See* 35–A M.R.S. §§ 752(1), 754(1), (2) (2009). CMP did not, however, provide training on its internal vertical clearance standards for power lines in rigging areas, which tracked with the Commission's rules that required a 45.5–foot minimum vertical clearance. *See* 9 C.M.R. 65 407 910–2, §§ 1–3 (2001); NESC Table 232–1(7), (8). The CMP employees involved with the lines at issue were unaware of the CMP vertical clearance standards or the statutory and regulatory standards.

[¶ 8] The court concluded that CMP had breached its duty to exercise due care when it maintained only a thirty-foot vertical clearance for the power line despite its knowledge that (1) sailboat masts were being raised and lowered at the Devereux boatyard, (2) the backstay of another mast had made contact with the power line in 1998, and (3) the proximity of power lines

to these boats was dangerous. The court found that CMP had also negligently deviated from its own safety policies, which required a 45.5–foot vertical clearance in an area "used for rigging and launching sailboats,"[2] and that it had failed to train its employees adequately on internal safety standards.

[¶ 9] The court awarded Smith damages of $783,108 for past and future medical rehabilitation; $1,107,523 for lost earnings; and $3,000,000 in general damages for a total of $4,890,631 in damages. Based on these findings and conclusions, the court entered its judgment on November 14, 2008.

■ [¶ 10] CMP timely moved for a new trial, for judgment as a matter of law, or to alter or amend the judgment pursuant to M.R. Civ. P. 50(d) and 59. The court denied CMP's motion. In its judgment on the motion, the court clarified that it had considered CMP's breach of statutory and regulatory duties in finding CMP negligent pursuant to common law negligence principles.[3] The court further found that it was foreseeable to CMP that Devereux employees might be working within ten feet of a power line in violation of the Overhead High-voltage Line Safety Act, 35–A M.R.S. §§ 752(1), 754(1), (2), in the area where the accident occurred because CMP employees had actual notice of the kind of work that went on at the boatyard near Route 166.

## II. BASIS OF THE APPEAL

[¶ 11] The gravamen of Smith's complaint was that CMP's power lines were

---

2. CMP's Distribution Construction Standard 305–11 (Waterway Clearances) was admitted as an exhibit. For 19.9–kV conductors, the Construction Standard requires a 45.5–foot minimum vertical clearance over "[a]reas used for rigging and launching sailboats."

3. By statutes and by common law, violation of a safety statute or regulation may be evidence of negligence but does not constitute negligence per se. *See* 35–A M.R.S. §§ 1501, 2305–A(1)(C), (2), (5) (2009); *Castine Energy Constr., Inc. v. T.T. Dunphy, Inc.*, 2004 ME 129, ¶ 10, 861 A.2d 671, 675; *French v. Willman*, 599 A.2d 1151, 1152 (Me.1991).

strung too low given their proximity to a boatyard. Articulating the reasons for its conclusion that CMP was negligent, the court found that CMP breached its duty of care in at least three ways: (1) by failing to comply with the Commission's rules regarding vertical clearances for power lines, *see* 9 C.M.R. 65 407 910–2, §§ 1–3 (2001); (2) by failing to follow its own vertical clearance standards; and (3) by failing to respond to known dangers created by the vertical clearance of its lines in that area and failing to train its employees about the rules and standards when it had actual knowledge that sailboat masts at the Devereux boatyard were near power lines along Route 166.

[¶ 12] In its original entry of judgment, the court indicated that it might not have concluded that CMP was negligent had it not found that CMP violated the Commission's rules. It is, therefore, unclear whether, independent of the rule violation, the court's findings regarding the breach of the standard of care would support its negligence finding. The parties dispute whether the rule violation was essential to the court's conclusion that CMP was negligent.

[¶ 13] Because the second two findings related to CMP's breach of the standard of care are amply supported by the record and would support the court's negligence finding, our analysis would end here if we were to determine that the rule violation was not essential to the court's decision. However, after close review of the court's findings, we cannot be certain that the court intended its decision on negligence to stand in the absence of its finding regarding the rule violation. Thus, we assume for purposes of analysis that the court's finding of a rule violation was fundamental to its negligence finding, and we must determine whether, as CMP contends, the court erred in finding that violation.

[¶ 14] CMP argues that the Commission's rules regarding minimum vertical clearances for power lines in areas "intended to be used by the public for rigging or launching sailboats," 9 C.M.R. 65 407 910–2, §§ 1, 3 (2001), do not apply in this case and, therefore, the case should be remanded to determine whether CMP was negligent in the absence of any rule violation. Although CMP raises other challenges, they are not persuasive and we address only the contested rule violation.

### III. STATUTORY AND REGULATORY BACKGROUND

[¶ 15] Transmission and distribution utilities, including CMP, are required to follow standards set forth by statutes, by the Commission's rules, and by the National Electrical Safety Code (NESC), in that order of priority. 35–A M.R.S. § 2305–A(1)(C), (2), (5) (2009). In chapter 910 of the Commission's rules, the Commission has set minimum vertical clearance standards for power lines in certain areas posted for launching or rigging sailboats. 9 C.M.R. 65 407 910–2, § 3 (2001). Chapter 910 defines the regulated areas as "any area that by signs, launching ramps, or other special facilities, land improvements or use indicates that *the area is intended to be used by the public for rigging or launching sailboats.*" 9 C.M.R. 65 407 910–2 § 1(A) (2001) (emphasis added). According to chapter 910, power lines in such areas must comply with NESC provisions as modified by the Commission's rules:

VERTICAL CLEARANCE REQUIREMENTS

All overhead lines of an aerial utility crossing water areas suitable for sailing, or public or private land and water areas posted for rigging or launching sailboats, shall comply with the vertical clearance requirements of Section 232 of the National Electrical Safety Code, Table 232–1, sections 7 and 8 thereof. . . .

9 C.M.R. 65 407 910–2 § 3 (2001). For the type of power line involved in Smith's accident, NESC Table 232–1 requires a 45.5–foot minimum vertical clearance over "[e]stablished boat ramps and associated rigging areas," and "areas posted with sign(s) for rigging or launching sailboats" on water bodies over 2,000 acres in size. *See* NESC Table 232–1(7), (8).[4]

[¶ 16] If the power line at issue were not in such an identified rigging area, the minimum vertical clearance for the line running along a road or street within a right-of-way would be only 18.5 feet. NESC Table 232–1(9).[5] Here, the power line with which the sail mast made contact had a thirty-foot vertical clearance. The question presented to the trial court, therefore, was whether the area in which Smith was injured was one for which the Commission rules required a 45.5–foot minimum vertical clearance for power lines.

## IV. ANALYSIS

■ [¶ 17] The determination of a rule violation involves both the interpretation of the rules, which we review de novo as a matter of law, *see Nergaard v. Town of Westport Island,* 2009 ME 56, ¶ 12, 973 A.2d 735, 739, and the finding of the facts that determine the applicability of the rules, which we review for clear error, *see Windham Land Trust v. Jeffords,* 2009 ME 29, ¶ 42, 967 A.2d 690, 702. We find no error in the court's factual findings, and we therefore look to the court's application of the regulations to those facts.

■ [¶ 18] To interpret a statute and its implementing regulations, we look first to the plain meaning of the language used. *See FPL Energy Me. Hydro LLC v. Dep't of Envt'l Prot.,* 2007 ME 97, ¶ 25, 926 A.2d 1197, 1204, *cert denied,* 552 U.S. 1100, 128 S.Ct. 911, 169 L.Ed.2d 730 (2008). When interpreting a technical statute or regulation, we generally defer to an administrative agency's own interpretation un-

4. The NESC Table 232–1 provides, in relevant part:

**Vertical Clearance of Wires, Conductors, and Cables Above Ground, Roadway, Rail, or Water Surfaces**

. . . .

| Nature of surface underneath wires, conductors, or cables | Open supply conductors, over 750 V to 22 kV; ungrounded guys exposed to 750 V to 22 kV (ft) |
|---|---|
| **Where wires, conductors, or cables cross over or overhang** | |
| . . . . | |
| 7. Water areas suitable for sailboating including lakes, ponds, reservoirs, tidal waters, rivers, streams, and canals with an unobstructed surface area of | |
| . . . . | . . . . |
| d. Over 2000 acres | 40.5 |
| 8. Established boat ramps and associated rigging areas; areas posted with sign(s) for rigging or launching sail boats | Clearance above ground shall be 5 ft greater than in 7 above, for the type of water areas served by the launching site |
| **Where wires, conductors, or cables run along and within the limits of highways or other road rights-of-way but do not overhang the roadway** | |
| 9. Roads, streets, or alleys | 18.5 |

Inst. of Electrical and Electronics Engineers, *National Electrical Safety Code C2–2002,* Table 232–1(7), (8), at 77–78 (2002 ed. 2001) (NESC Table 232–1) (footnotes omitted).

5. *See* NESC Table 232–1, *supra* note 4.

less the statute or regulation plainly compels a different interpretation. *See Schwartz v. Unemployment Ins. Comm'n,* 2006 ME 41, ¶ 9, 895 A.2d 965, 970.

[¶ 19] Based on the plain language of the Commission's rules at issue here, the court did not err in concluding that Devereux Marine is an area posted for rigging sailboats—that is, an "area that by signs, launching ramps, or other special facilities, land improvements or use indicates that the area is intended to be used by the public for rigging or launching sailboats." 9 C.M.R. 65 407 910–2, § 1(A) (2001). Devereux is an established boatyard with signs and a long, visible history of use by the public for rigging and launching sailboats. Noting the use of the term "public" in chapter 910, CMP emphasizes that Devereux is a private operation; yet, there is no discernable rationale for the Commission to have intended for the noun "public" to mean anything other than its ordinary meaning: "the people as a whole: POPULACE, MASSES." Webster's Third New International Dictionary of the English Language Unabridged 1836 (2002). Like many other private companies, Devereux operates a facility that is open for use by the public at a price. Devereux's status as a private company does not diminish the applicability of the Commission's rules.

[¶ 20] The Commission's interpretations of these technical rules further support this conclusion. *See Schwartz,* 2006 ME 41, ¶ 9, 895 A.2d at 970. In 1988, the Commission entered an order commencing rulemaking on the matter of vertical clearance standards for lines crossing areas of water and adjacent rigging and launching areas. *Order Commencing Rulemaking,* No. 88–97 Order (Me. P.U.C. May 3, 1988). After holding a public hearing, the Commission adopted a set of rules that tracked the NESC but with some modifications. *Order Adopting Rule and Statement of Factual and Policy Basis,* No. 88–97 Or-

der (Me. P.U.C. July 19, 1988). As one modification, the Commission provided that the clearances for line 8 of NESC Table 232–1 would apply to "public or private land and water areas posted for rigging or launching sailboats." *Id.* at 6 & attached rule (C.M.R. 407 91, § II(a) (effective Aug. 9, 1988)). On this topic, the Commission clarified its intention that the term "posted" be construed broadly:

> [CMP and others] also raised the question of the definition of a rigging and launching area. By adopting Table 232–1 of the Code, section 8 defines such an area as "public or private land and water areas posted for rigging or launching sailboats." Although we adopt that definition, we point out that *"posted" is not limited to having a sign on it.* We adopt the definition set forth in the National Electrical Safety Code Handbook, 1984 edition, which specifies that "these requirements apply only to posted areas and, also intentionally, did not specify the form of posting—*it may be by signs, launching ramps, or other special facilities or land improvements or use which indicate that the area is intended for such use.*" We intend that within such definition would [be] all boat launching sites shown on the current public access inventory maintained by the Department of Conservation.

*Id.* at 6 (emphasis added).

[¶ 21] In 2001, the Commission opened rulemaking for the purpose of clarifying the continued effect of its 1988 modifications to the NESC. *Order Adopting Amended Rule,* No. 2001–374 Order, at 2 (Me. P.U.C. Sept. 10, 2001); *see* 35–A M.R.S. § 2305–A(5) (stating that additional safety measures imposed by the Commission remain in effect for ten years unless repealed or reaffirmed by order). The Commission reaffirmed its definition of

"areas posted for rigging or launching sailboats," and stated:

> Significantly, the Commission ... provided a broader definition of "areas posted for rigging or launching sailboats" in Chapter 91 [6] than the definition provided by the 1987 Edition of the Code. Basing its definition on a definition formerly permitted by the 1984 Edition of the Code, the Commission clarified that "posting" in Chapter 91 would mean "posting by signs, launching ramps, or other special facilities or land improvements or use which indicates that the area is intended for such use" rather than by signs only. Docket No. 88–97, *Order* at 6. The 1997 Edition of the Code is silent on the definition of "areas posted for rigging and launching sailboats." Maintaining the broader definition originally provided in Chapter 91 does impose an additional safety measure beyond what the current Code requires.

*Id.* at 4 (footnote added).

[¶ 22] Based on the Commission's pronouncements, it is evident that the Commission intended for chapter 910 to cover rigging and launching facilities broadly. Rather than requiring specific signage to identify the facilities to which the chapter would apply, the Commission most recently stated that the vertical clearance standard applies in all areas "post[ed] by signs, launching ramps, or other special facilities or land improvements or use which indicate[ ] that the area is intended for such use rather than by signs only." *Id.* (quotation marks omitted). Although the Commission stated in 1998 that it intended to include within the definition all locations on the then "current public access inventory maintained by the Department of Con-servation," the Commission did not state that the reach of its rules was *limited to* those inventoried facilities. *See Order Adopting Rule and Statement of Factual and Policy Basis,* No. 88–97 Order, at 6 (Me. P.U.C. July 19, 1988).

[¶ 23] In view of the language of the Commission's technical rules, *see FPL Energy Me. Hydro LLC,* 2007 ME 97, ¶ 25, 926 A.2d at 1204, and the Commission's interpretations of its rules, *see Schwartz,* 2006 ME 41, ¶ 9, 895 A.2d at 970, the trial court did not err as a matter of law in concluding that chapter 910 of the Commission's rules and its reference to line 8 of NESC Table 232–1 governed the minimum vertical clearance of the power line at issue.

[¶ 24] CMP also contends that chapter 910 of the Commission's rules only applies to power lines "*crossing* ... public or private land and water areas posted for rigging or launching sailboats." 9 C.M.R. 65 407 910–2 § 3 (2001) (emphasis added). It argues that the line in question does not cross an area "posted for rigging or launching sailboats" but rather runs along and within a public highway right-of-way. Route 166 and the right-of-way holding the power line bisect an active boatyard. The court conducted a view of the boatyard and the power line, and, based on its direct observations, other factual findings, and the Commission's rules, could reasonably have found that the power line crossed an area "posted for rigging or launching sailboats" even though it was within a public highway right-of-way.

[¶ 25] For the foregoing reasons, we affirm the court's conclusion, supported by competent evidence in the record, that CMP breached its standard of care when it

---

6. The rule was previously numbered as chapter 91. As part of the 2001 rulemaking order, the Commission renumbered the rule as chapter 910 to conform to the practice of assign-ing three-digit numbers to rules. *Order Adopting Amended Rule,* No. 2001–374 Order, at 1 n.1 (Me. P.U.C. Sept. 10, 2001).

violated the Commission's rules that imposed the 45.5–foot vertical clearance requirement set forth in line 8 of Table 232–1. Accordingly, we affirm the decision of the trial court.

The entry is:

Judgment affirmed.