STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, SS.                                     DOCKET NO. AP-21-33

DENIS L. CHANDONNET,                    )
                                        )
        Petitioner,                     )
                                        )
    v.                                  )
                                        )
MAINE DEPARTMENT OF                     )        DECISION AND ORDER
HEALTH AND HUMAN SERVICES,              )
                                        )
        Respondent,                     )
                                        )
NILS AND PATRICIA PEARSON,              )
                                        )
        Parties-in-Interest.            )
                                        )

Before the court is Petitioner Denis Chandonnet's appeal filed pursuant to Rule 80C of the Maine Rules of Civil Procedure. He asserts that Respondent Maine Department of Health and Human Services ("DHHS") erroneously approved an application to construct a new septic system submitted by Parties-in-Interest Nils and Patricia Pearson. Specifically, he asserts that (1) the Pearsons' disposal field is undersized in violation of DHHS rules; (2) the Pearsons failed to comply with the minimum point score requirement for properties within the Shoreland Zone, and; (3) the system violates stream setbacks without meeting mandatory variance criteria.

## FACTS

The Pearsons own a small undeveloped lot of land with frontage on Great East Lake in Acton, Maine. R. 3, 172, 175. The lot is located within the Shoreland Zone, with a small tributary stream that traverses the property and feeds into the lake. R. 3, 175. Chandonnet owns property abutting the Pearson lot.

In November 2020, the Pearsons submitted an application to develop a septic system on the lot. R. 172. The proposed septic system design incorporates a Singulair pretreatment system—a technology that DHHS approved in 2018, along with the manufacturer's request

1

to allow Singulair users a 75% reduction in disposal field size. R. 174, 218. For their disposal field, the Pearsons proposed a design using concrete chambers in lieu of a traditional stone field disposal system. R.412-415.

Moreover, because the proposed septic system design contemplated departures from certain DHHS rules, the Pearsons needed to obtain a variance from DHHS. So, pursuant to the rules, the local plumbing inspector and the site evaluator completed a variance request and application and submitted the paperwork to DHHS. R. 4. The Pearsons' application package sought a variance to (1) reduce the stream setback from 50 feet down to 29 feet, (2) reduce the property line setback from 10 feet down to 8 feet, and (3) "grade the fill at 2:1." R. 4, 172. The site evaluator and local plumbing inspector recommended that the variance request be approved. R. 4.

On December 28, 2020, DHHS State Site Evaluator Brent Lawson approved the application and variance request with certain conditions. R. 4, 177-78. Chandonnet then filed an intra-agency appeal, and a hearing de novo was held before hearing officer Miranda Benedict. R. 20, 38. Mr. Lawson testified on behalf of DHHS. After considering the parties' written closing arguments, the hearing officer issued a decision affirming DHHS's approval of the Pearsons' application package. R. 1-20. This 80C appeal followed.

STANDARD OF REVIEW

The Law Court has frequently reaffirmed the principle that judicial review of administrative agency decisions is "deferential and limited." *Passadumkeag Mountain Friends v. Bd. of Envtl. Prot.*, 2014 ME 116, ¶ 12, 102 A.3d 1181 (quoting *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128). The court is not permitted to overturn an agency's decision "unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or error of law; or is unsupported by the evidence in the record." *Kroger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 7, 870 A.2d 566. "On questions involving the interpretation and application of technical statutes or regulations, this court gives deference to the administrative agency unless the statutes or

2

regulations plainly compel a contrary result." *Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991). The party seeking to vacate a state agency decision has the burden of persuasion on appeal. *Anderson v. Me. Pub. Emp. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501. Because the hearing officer acted as a fact-finder and reviewed the substantive issues de novo, the court will review the hearing officer's decision directly. *Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶ 17, 15 A.3d 1263; 10-144 C.M.R. 241 § VII(C)(1).

## DISCUSSION

### I. Whether the Pearsons' disposal field is undersized in violation of DHHS rules.

First, Chandonnet argues that the Pearsons' disposal field is undersized, and DHHS permitted reductions to the disposal field size calculation that were not allowed under its rules. At the administrative hearing, Mr. Lawson testified that had the Pearsons opted for a traditional stone and pipe system, their disposal field would need an infiltration area of 594 square feet. R. 412. But with the technology and proprietary devices utilized by the Pearsons, the disposal area could be reduced to 148.5 square feet. R. 412-14. Thus, Lawson explained, the Pearsons' proposed disposal field—which was 180 square feet—exceeded minimum requirements. R. 415.

The record reveals that the Pearsons' proposed design incorporates a relatively new pretreatment system, the Singulair Model 960. Pursuant to Section 6(HH) of the rules, DHHS Environmental Specialist James Jacobsen conducted a review of the Singulair system. R. 218; 10-144 C.M.R. 241 § 6(HH). In 2018, Mr. Jacobsen approved the system for use in Maine as he is authorized to do under Section 6(HH). *Id.* Moreover, Mr. Jacobsen approved the manufacturer's request to allow a 75% reduction in the size of the disposal field. R. 218.

Chandonnet challenges DHHS's decision to apply a 75 % reduction factor in calculating the size of the Pearsons' disposal field. Chandonnet points to Table 4B of the DHHS rules, which provides for various upward and downward adjustments to disposal field size based on effluent strength. Specifically, Table 4B states:

3

**TABLE 4B**
**ADJUSTMENT FACTOR FOR WASTEWATER STRENGTHS**
**DIFFERENT FROM TYPICAL DOMESTIC WASTEWATER**

| Strength of wastewater entering the disposal field (BOD5 plus TSS) | Adjustment factor (AF) |
|---|---|
| 30 or less milligrams/liter | 0.5 |
| 52 | 0.6 |
| 82 | 0.7 |
| 122 | 0.8 |
| 175 | 0.9 |
| 240 | 1.0 |
| 320 | 1.1 |
| 420 | 1.2 |
| 530 | 1.3 |
| 660 | 1.4 |
| 810 | 1.5 |
| 985 | 1.6 |
| 1180 | 1.7 |
| 1400 | 1.8 |
| 1645 | 1.9 |
| 2000 | 2.0 |

According to Chandonnet, Table 4B contemplates a maximum reduction factor of 50 %. Moreover, Chandonnet claims that the "DHHS Rules contain no mechanism for the Department to issue individualized adjustment factors to disposal field sizing." The court disagrees.

Relevant to this issue is Section 4(H)(3)(a), which states:

Values less than 240 mg/L: . . . The constructed size of a proprietary device disposal field may be reduced by use of the appropriate factor from Table 4B, provided a reduction is allowed by the manufacturer. *If an adjustment factor resulting in reduction in the disposal area of more than 50 percent is utilized,* the HHE-200 Form submitted for permitting must delineate a disposal area without the use of any adjustment factor.

144 C.M.R. 241 § 4(H)(3)(a) (emphasis added). Thus, the rules themselves contemplate that there may be situations where reductions will exceed 50%.

Moreover, as the hearing officer noted, the rules afford DHHS the flexibility to adopt standards in light of new technology.[1] *See id.* § 2(C)(2) (recognizing that there "may

---

[1] Chandonnet asserts that the hearing officer's findings and conclusions on the disposal field size issue are insufficient. While the hearing officer could have been more specific, the record reveals that she considered and rejected Chandonnet's argument and sufficiently described her reason for doing so. In her written decision, the hearing officer referenced Chandonnet's argument

be subsurface wastewater disposal requirements essential for the sanitation and safety of the occupants thereof that are not specifically covered by [the Department's] Rules. Such requirements shall be determined by the Department, with the concurrence of the LPI"). In fact, Section 6(HH) allows DHHS to review and approve new technologies using a specified process. *Id.* § 6(HH). The Pearsons' reductions were based on proprietary devices and technologies approved through Section 6(HH)'s comprehensive review procedures. The court is not persuaded that Table 4B limits the reductions that may be achieved through these methods.

## II. Compliance with the minimum point score requirements.

Chandonnet's next argument centers on Section 7(C)(5), which describes a minimum point value that must be met for sites within the Shoreland Zone. On appeal, Chandonnet challenges the hearing officer's determination that the point system did not apply to the Pearson application. The hearing officer reasoned that the minimum point requirement applies only to sites with inadequate soil conditions; as the Pearsons' site met the minimum soil standards, the point system was not implicated. R.13. Thus, the court must decide whether the point system applies to *all sites* within the Shoreland Zone, as Chandonnet argues, or only those sites that fail to meet minimum soil standards. Resolution of this issue turns on the proper interpretation of DHHS's rules.

When interpreting statutes and agency rules, the court "look[s] first to the plain meaning of the language used." *Smith v. Cent. Me. Power Co.*, 2010 ME 9, ¶ 18, 988 A.2d 968. In doing so, the court will "construe that language to avoid absurd, illogical or inconsistent results" and "consider the whole statutory [or regulatory] scheme of which the section at issue forms a part so that a harmonious result . . . may be achieved." *Urrutia v.*

---

regarding the allegedly undersized disposal field. R. 15. Moreover, it is evident why the hearing officer was not persuaded: Chandonnet's argument overlooked DHHS's authority to rely on technology to approve systems on sites that would otherwise be too small to accommodate a traditional stone and pipe system. R. 16. Thus, the court finds that the administrative record is sufficient to permit judicial review.

5

*Interstate Brands Int'l*, 2018 ME 24, ¶ 12, 179 A.3d 312 (quotation marks omitted). Provisions are "not reviewed in isolation but in the context of the statutory and regulatory scheme." *Conservation Law Found. v. Dep't of Envtl. Prot.*, 2003 ME 62, ¶ 23, 823 A.2d 55. Moreover, "[a] plain language interpretation should not be confused with a literal interpretation . . . ." *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 20, 107 A.3d 621. The court must "avoid an overly simplistic or overly broad interpretation" that undermines the drafter's intent. *Id.* ¶ 23.

If the court's analysis reveals that the language is unambiguous, the provision will be plainly construed. *Taylor v. PUC*, 2016 ME 71, ¶ 6, 138 A.3d 1214. If, however, the court finds an ambiguity—i.e., the provision is "reasonably susceptible of different interpretations"—the court will "review the [agency's] construction of the ambiguous [provision] for reasonableness." *Id.* (quotation marks omitted). "An agency's interpretation of an ambiguous statute [or regulation] it administers is reviewed with great deference and will be upheld unless the [provision] plainly compels a contrary result." *Cent. Me. Power Co. v. PUC*, 2014 ME 56, ¶¶ 18-19, 90 A.3d 451 (quotation marks omitted).

The court's analysis begins with the language of Section 7(C)(5), which states: "Minimum point value for sites within the shoreland zoned areas of major waterbodies/courses: Any proposed first-time disposal system located within the Shoreland Zone must score at least 65 points using Tables 7C through 7M to be considered acceptable . . . ." 10-144 C.M.R. 241 § 7(C)(5). Chandonnet's interpretation is appealing at first glance; Section 7(C)(5) suggests that the 65-point requirement is applicable to "*[a]ny proposed first-time disposal system located within the Shoreland Zone,*" which would seem to include systems on sites in the Shoreland Zone that satisfy minimum soil standards. *Id.* (emphasis added). But Section 7(C)(5) cannot be read in isolation. *Conservation Law Found.*, 2003 ME 62, ¶ 23, 823 A.2d 55. When viewed in the context of the full regulatory framework, the phrase is susceptible to a more restrictive construction—one that limits the 65-point requirement to Shoreland Zone sites that fail to meet minimum soil standards. *In re Guardianship of Patricia S.*, 2019 ME 23, ¶¶ 12-14, 202 A.3d 532 (finding the phrase

6

"[a]ny competent person" was ambiguous and susceptible to a more limited construction "[w]hen viewed in the context of the full statutory framework").

Several provisions in the rules give rise to this more restrictive interpretation. First, Section 7(B)(3)(a) suggests that Tables 7C through 7M—which are integral to the point system—are used to assess the suitability of sites that do not comply with minimum soil conditions. 10-144 C.M.R. 241 § 7(B)(3)(a) ("For a site that does not comply with the minimum soil conditions in Table 4F, the LPI or Department will use the criteria contained in Tables 7C through 7M, to evaluate the potential for a variance . . . ."). Second, the tables themselves appear to be aimed at sites that do not meet soil condition requirements. For instance, the heading preceding Tables 7C-7M suggests that the tables are intended for the assessment of soil suitability. The heading states: "Tables 7C-7M[,] Factors Used in Assessing the Potential for a First-Time System *for Soil Conditions Inside the Shoreland Zone.*" R. 121 (emphasis added) (capitalization omitted).

Additionally, Table 7D—which assigns points based on soil depths to groundwater or other restrictive layers—supports DHHS's interpretation. Pointing to Section 4(A)(3)(b) of the rules, Lawson explained that systems within the Shoreland Zone need "15 inches of good suitable soil," meaning the system needed to be located on soil with a 15-inch minimum depth to seasonal groundwater and bedrock. R. 398; 10-144 C.M.R. 241 § 4(A)(3)(b). As the Pearson site contained 30 inches of suitable soil, the site evaluator "did not have to use this point system because [the Pearsons' site] met the rules of 15 inches." R. 399. The manner by which Table 7D assigns points is consistent with the understanding that the point system is not intended for sites with rule-compliant soils:

### TABLE 7D
### SEASONAL GROUNDWATER OR RESTRICTIVE LAYER

| Depth to seasonal groundwater or restrictive layer | Points |
|---|---|
| 14 inches | 20 |
| 13 inches | 15 |
| 12 inches | 9 |
| 11 inches | 6 |
| 10 inches | 3 |
| 9 inches | 0 |
| Less than 9 inches | Not Permitted |

Indeed, Table 7D does not recognize a category for sites with depths meeting and exceeding the 15-inch minimum requirement, let alone award any additional points for doing so. By contrast, sites that satisfy and exceed other minimum requirements, like the minimum setback requirements, are entitled to extra points. *See* Table 7F & 7G; *see also* Table 7B. One way to reasonably resolve this discrepancy is to interpret the tables as DHHS did—that is, Table 7D and the other tables were never intended to apply to sites with suitable soil.[2]

In short, although Section 7(C)(5) applies the 65-point requirement to "[a]ny proposed first-time disposal system located within the Shoreland Zone," the provision is rendered ambiguous when considered in light of the entire regulatory scheme. The court finds that DHHS reasonably resolved the conflicts in the regulatory framework and its interpretation is entitled to deference.

---

[2] DHHS's position that the point system applies to sites with inadequate soil conditions appears to be consistent with its historical interpretation and practice. *See* Hoxie et al., *A Numerical Classification System to Determine Overall Site Suitability for Subsurface Wastewater Disposal* (Oct. 1987), *available at* https://www.maine.gov/dhhs/mecdc/environmental-health/plumb/documents/numerical-classification.rtf (explaining that the new system variance "procedure assigns points to various site and system design characteristics and sets a minimum passing score of 50 points, with 65 points required for properties in Shoreland Zoning areas, and 75 points for lots in proposed subdivisions. *Properties not meeting the requirement of original soil over limiting factor are judged by this system*" (emphasis added)); *see also* 144 C.M.R. 241 § 16, pgs. 16.1-16.3 (revised through October 1, 1988) (*see* Table 16-1 – "for land that does not comply with the minimum soil condition criteria").

**III. Whether the Pearsons' septic system violates stream setback requirements without meeting mandatory variance criteria.**

Chandonnet's final argument pertains to DHHS's decision to approve a stream setback variance. Pursuant to Table 7B of the rules, the minimum setback requirement from the edge of the disposal system to a stream is 50 feet. R. 120. The Pearsons intend to place their system within 29 feet of the stream and requested a variance accordingly. Because the Pearsons' proposed system is situated within the Shoreland Zone, their variance request also implicates Section 12 of the rules. Section 12 sets forth additional requirements for Shoreland Zone sites, including maintaining a minimum setback of 75-feet for all ground disturbances and clearing of vegetation. 10-144 C.M.R. 241 § 12(B).

The Pearsons' request did not explicitly seek a variance from Section 12's 75-foot setback requirement. At the hearing, DHHS took the position that the Pearsons had impliedly made a variance request to reduce the 75-foot setback and that DHHS had impliedly granted a variance to do so. R. 386-388, 391-392; 404. This is Chandonnet's first point of contention.

The court agrees with DHHS that a variance under Section 12 was implicit. As the hearing officer observed, "it would be nonsensical for the Department to grant a variance without adequate setback for soil disturbance." R. 12. A *subsurface* disposal system was at issue, so approving the underground system necessarily authorized the ground disturbances and clearing associated with installation. Additionally, Table 7B—which the Pearsons explicitly referenced in their variance request—incorporates Section 12 by way of Footnote e. *See* R. 120-21, 172.

Chandonnet further argues that the normal variance procedures do not apply to the Section 12 setbacks, noting that the Section 12 setbacks are in place to assure compliance with the Maine Natural Resources Protection Act ("NRPA"). The court, however, does not see anything that precludes DHHS from permitting a variance from the setback requirements of Section 12. Section 12(A) states:

9

No Further Permits Required: The filling, alteration of, or work adjacent to, wetlands and waterbodies for activities associated with the installation of subsurface wastewater disposal systems, is allowed provided it is done in accordance with the requirements of these Rules pertaining to work adjacent to, or within, wetlands and water bodies including the installation criteria in Sections 12(B)(4) and 12(C). These Rules have been designed to assure that no permitting is required for the installation of subsurface wastewater disposal systems, unless DEP - NRPA or Shoreland Zoning, or LUPC standards are exceeded. . . .

Special Note: DEP or LUPC permits are not required for the installation of subsurface wastewater disposal systems designed and installed in accordance with these Rules. Failure to meet setback, erosion control, vegetation clearing, or soil disturbance standards may result in enforcement action by the appropriate state or local agency with jurisdiction. Questions/issues should be directed to and resolved by DEP, LUPC or municipal officials prior to installation.

10-144 C.M.R. 241 § 12(A).

As the court reads it, Section 12 does not constrain DHHS from exercising its variance authority. In fact, the "Special Note" paragraph appears to acknowledge the potential that DHHS might permit a Section 12 variance. Nevertheless, that variance might run afoul of another agency's rules. The provision serves as a word of caution that DHHS's approval does not excuse the applicant from complying with the rules of other state and local agencies. Indeed, DHHS is not responsible for policing compliance with another agency's rules. Although Chandonnet urges the court to "require Pearson to obtain an additional NRPA permit from [DEP]," that issue is beyond the scope of this appeal.

## CONCLUSION

The entry is:

The Petition for Judicial Review is DENIED, and the decision of DHHS approving the Pearsons' application is AFFIRMED.

The clerk is directed to incorporate this Order into the docket of this case by notation reference in accordance with M.R. Civ. P. 79(a).

DATED: May 9, 2022

William R. Stokes
Justice, Maine Superior Court

Entered on the docket 5/9/22

11

Kennebec                          Docket No.AP-21-33
                                   County

                                                                                       F

Action:  80C                                         **J. Stokes**


Denis Chandonnet                       vs              Maine DHHS

---

Plaintiff's Attorney                                 Defendant's Attorney

Gordon R Smith, Esq                                  Benjamin Ford, Esq.   (PII)
One Portland Square                                  22 Free Street, Ste. 403
Portland, ME 04101-4054                              Portland, ME 04101

                                                     Margaret Machaiek, AAG
                                                     6 State House Station
                                                     Augusta, Maine  04333


Date of Entry

---

| Date | Entry |
|---|---|
| 09/17/21 | Petition for Review of Final Agency Action, filed (09/16/21) s/Smith,Esq |
| 10/01/21 | Entry of Appearance filed on behalf of Parties in Interest, Nils and Patricia Pearson, filed (09/30/21). s/Ford, Esq. |
| 10/08/21 | Entry of Appearance by AAG for Dept. of Health and Human Services. s/Machaiek, AAG. |
| 10/21/21 | Record, filed (10/18/21) s/Machaiek, AAG |
| 10/21/21 | Notice and Briefing Schedule Issued. Notice sent to Parties/Counsel. |
| 11/02/21 | Amended Notice & Briefing Schedule issued Notice to parties/counsel |
| 12/13/21 | Petitioner Brief, filed (11/29/21). s/Smith, Esq. |
| 01/06/21 | Respondent's Brief, filed (12/27/21). s/Machaiek, AAG |
| 01/06/21 | Party-In-Interest's 80C Brief, filed (12/29/21). s/Ford, Esq. |
| 01/10/21 | Petitioner's Reply Brief, filed. s/Smith, Esq. |
| 01/10/21 | Case under advisement with Justice Stokes |
| 05/09/22 | DECISION AND ORDER, Stokes, J. The Petition for Judicial Review is DENIED and the decision of DHHS approving the Pearsons' application is AFFIRMED Copy to parties and repositories |
| 05/09/22 | Case closed |